**F I L E D**

PUBLISH

**January 22, 2007**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

ALASSANE SARR,

  Petitioner,

v.

ALBERTO R. GONZALES, United
States Attorney General,

  Respondent.

No. 05-9606

**PETITION FOR REVIEW OF AN ORDER
FROM THE BOARD OF IMMIGRATION APPEALS
(AGENCY NO. A 95-377-329)**

Sharon A. Healey, Seattle, Washington, for Petitioner.

Irene M. Solet (Michael J. Singer and Peter D. Keisler, Assistant Attorneys
General, with her on the brief), Civil Division, Department of Justice,
Washington, District of Columbia, for Respondent.

Before **LUCERO**, **McCONNELL**, and **HOLMES**, Circuit Judges.

**McCONNELL**, Circuit Judge.

Petitioner Alassane Sarr seeks review of a final order of removal issued by

the Bureau of Immigration Appeals (BIA), which affirmed a determination by an

Immigration Judge (IJ) denying Mr. Sarr's application for asylum, withholding of removal, and relief under the Convention Against Torture (CAT). We reverse the decision of the BIA and remand for further proceedings.

## I. BACKGROUND

### A. Mauritania

The Islamic Republic of Mauritania is located in northwest Africa, bordered by the Atlantic Ocean, Senegal, Mali, Algeria, and Western Sahara. Formerly a French colony, the country gained its independence in 1960, an event that triggered a large migration of native sub-Saharan peoples to the area north of the Senegal River.[1] Among these peoples were the Pulaar, or Fulani, a black African nomadic group with roots in the region dating back to at least the fourteenth century.[2] The country's ethnic makeup is now approximately forty percent African-Arab-Berber (often called "Black Moor"), thirty percent Arab-Berber ("White Moor"), and thirty percent Black African (mostly Wolof, Tukulor,

---

[1]*See* U.S. Department of State, Bureau of African Affairs, *Background Note: Mauritania*, http://www.state.gov/r/pa/ei/bgn/5467.htm (last visited Dec. 26, 2006) (hereinafter "Mauritania Note").

[2] *See* Fulani Empire, in 5 The New Encyclopedia Britannica 42 (15th ed. 2002). It appears that the terms "Pulaar," "Pular," "Haalpulaar," "Fulfulde," and "Fulani" are used somewhat interchangeably to describe both an ethnic group and its native tongue. *See*, *e.g.*, Annette Harrison, Fulfulde Family Language Report (2003), http://www.sil.org/silesr/2003/silesr2003-009.htm (last visited Dec. 26, 2006); Mauritania Note, *supra* note 1. During the asylum hearing, Mr. Sarr (or perhaps his translator) used "Fulani" and "Pulaar" with reference to both his ethnic group and his language. For simplicity, we will refer to both as Fulani.

2

Soninke, and Fulani).[3]  Over time, conflict arose between the majority Moor population, which viewed Mauritania as an Arab nation, and the black Africans, who sought a more substantial role for sub-Saharan peoples and their way of life. The conflict came to a head in 1989 when violence erupted between the groups and thousands of black Africans were forced to leave the country and had their land and property confiscated.  Though the Mauritanian government denies the allegations, a human rights group maintains that "[s]ince 1989, tens of thousands of black Mauritanians have been forcibly expelled, and hundreds more have been tortured or killed . . . .  The campaign to eliminate black culture in Mauritania, orchestrated by the white Moor rulers, reached its height in the late 1980s and early 1990s . . . ."  Human Rights Watch/Africa, *Mauritania's Campaign of Terror* 1 (1994), Admin. R. at 270.  The State Department has also recognized the "intercommunal violence that broke out in April 1989."  Mauritania Note, *supra* note 1.

**B.  Mr. Sarr's Story**

On March 3, 2001, Mr. Sarr used a false passport to enter the United States via New York City.  On January 28, 2002, he filed applications for asylum, withholding of removal, and protection under the CTA with the Immigration and Naturalization Service (INS), the functions of which are now handled by U.S.

---

[3]*See* Mauritania Note, *supra* note 1; World Data: Mauritania, in Encyclopedia Britannica (2006) (online version), http://www.britannica.com/wdpdf/Mauritania.pdf (last visited Dec. 26, 2006).

Citizenship and Immigration Services within the Department of Homeland Security. During the pendency of these applications, Mr. Sarr relocated to Colorado, and the case was transferred to that venue.

In his asylum application and at his immigration hearing, Mr. Sarr claimed that he was a member of the Fulani ethnic group and that he was born in Mauritania in 1976. His father owned a three-acre farm in Kaedi, Mauritania, near the Senegalese border, where Mr. Sarr resided with his family through the age of thirteen. On September 20, 1989, five soldiers (whom Mr. Sarr identified as "white") arrived at the Sarr family home and demanded proof of the family's identity from Mr. Sarr's father. He complied, whereupon the soldiers promptly destroyed the documents. Mr. Sarr also explained to the court, however, that his mother retained his birth certificate, a document he later produced at his asylum hearing as proof of his identity. After destroying the papers, the soldiers assassinated Mr. Sarr's father, beat Mr. Sarr and the other members of his family, and removed the Sarrs from their home. After a brief detention in the local police station, the family members were forced to cross the Senegal River by rowboat, where they were met by Red Cross workers and admitted to a refugee camp in Matam, Senegal. During the asylum hearing, Mr. Sarr described in detail the circumstances of this incident, including the name of the military officer who led the attack on the Sarr family, the vehicle in which the soldiers traveled, the weapons they carried, and the instruments with which they beat the surviving

4

members of the family.

According to Mr. Sarr, he remained in the refugee camp until 1996, at which time he moved to the city of Dakar in the hopes of finding help for his family and a "better life." Admin. R. at 89–90. There he became a peddler of merchandise for a shop owner. Mr. Sarr testified that he sent portions of his earnings to his siblings, who remained in the Matam refugee camp. Mr. Sarr also testified that he was unable to obtain legitimate identification or open a bank account while in Dakar. In 2001, Mr. Sarr purchased a false passport and left Dakar for the United States. He testified that he feared if he returned to Mauritania, "[t]he same thing that happened to us in 1989" would happen again. Supp. Admin. R. at 1.[4] He stated that he had lost touch with his siblings, who presumably are still in Senegal.

**C. The Immigration Judge's Opinion**

The evidence before the IJ consisted of Mr. Sarr's asylum application and the INS's response, Mr. Sarr's Mauritanian birth certificate, Mr. Sarr's own testimony, which was presented through an interpreter, psychiatric analyses of Mr. Sarr, several State Department Country Reports on Mauritania, and a "packet

[4] This page of the hearing transcript was omitted from the certified Administrative Record, where it would have been between pages 95 and 96. The government submitted the page as a supplement to the record.

of material" submitted by Mr. Sarr regarding Mauritania and his situation there.[5] Admin. R. at 53. The government performed a forensic examination of the birth certificate, which did not reveal any changes to the document. At the beginning of the hearing, counsel for the Department of Homeland Security explained that the "particular problem with this case" was that Mr. Sarr "had stated to the asylum officer that all family documents were destroyed in the attack, yet he was able to produce the birth certificate. A huge inconsistency." *Id.* at 77. Counsel also argued that Mr. Sarr's description of conditions in Mauritania "was inconsistent with known conditions in Mauritania" and that "repatriation has been occurring for some time." *Id.*

At the conclusion of the hearing, the IJ delivered an oral decision rejecting Mr. Sarr's petitions for asylum and related relief based upon an adverse credibility finding. The IJ found that Mr. Sarr "failed to show past persecution or a well-founded fear of persecution," and that his testimony "was not sufficiently detailed, consistent or believable to provide a plausible and coherent account of the basis for his fears." *Id.* at 53–54. In particular, the IJ expressed doubt that Mr. Sarr was truly from Mauritania: "The issue before the Court is whether this guy is from Mauritania or not. I have no idea and I didn't give any credibility to his testimony." *Id.* at 55; *see also id.* at 57 ("Again, what this Court has problems

[5] The government sought to introduce the testimony of the asylum officer, but was refused. The government preserved its right to present this evidence in the case of remand.

with is credibility. I don't know if he's from Mauritania. I don't know if what he's telling me is the truth. He has absolutely nothing to show me that would suggest that he is, in fact, from Mauritania.").

The IJ identified three reasons for doubting Mr. Sarr's story. First, and most importantly, the IJ doubted Mr. Sarr's account of how his birth certificate was preserved:

> [The respondent testified that] his birth certificate that his mother had on her when she died is what he produced for this Court. The problem is when I was listening to the testimony in this particular matter he told us quite clearly that when the soldiers came to his house that, in fact, they asked his father if, in fact, they were Mauritanians or not. That his father brought out the paperwork regarding the family and that the soldiers destroyed all of the paperwork. That nothing was available. Now, all of a sudden, he comes up with a birth certificate. From where, I have no idea other [than] what he said, the mother had it on her. Well, according to what [he told] us previously, . . . the father had it and handed it to the soldiers and they destroyed all of the paperwork and . . . there was nothing left there.

*Id.* at 54-55. Second, the IJ noted that Mr. Sarr gave two different dates—1994 and 1991—for his mother's death. Third, the IJ questioned why Mr. Sarr did not know the address or phone number of the man for whom he had worked in Dakar, and did not attempt to contact him to obtain corroboration of his story.

The IJ found in favor of Mr. Sarr on the issue of past and current conditions in Mauritania. In particular, the IJ stated: "[T]here was a problem between blacks and white Moors [in Mauritania in 1989] . . . . I agree with counsel for the respondent that I don't think things in Mauritania have changed at all." *Id.* at 55.

7

**D. The BIA's Opinion**

Mr. Sarr appealed the IJ's decision to the BIA, which affirmed in a short opinion by a single member. After noting that it had "reviewed the record of proceeding, the Immigration Judge's decision[,] . . . and the respondent's contentions on appeal," the BIA "agree[d] with the Immigration Judge that [Mr. Sarr] has failed to carry his burden of proof to demonstrate his actual identity, and did not establish either past persecution or a well-founded fear of future persecution that would justify a grant of asylum" or the other requested forms of relief. *Id.* at 2. The BIA recognized that the IJ did not "completely describe" Mr. Sarr's testimony regarding how his mother retained the birth certificate, but found that "the record reflects that [Mr. Sarr] made contradictory statements with regard to the central issue of the alleged destruction of his family's documents and the issue of when his mother, who he claimed successfully preserved at least one family document, passed away." *Id.* at 2–3. Consequently, the BIA upheld the IJ's adverse credibility finding as not clearly erroneous.

The BIA made no finding with respect to changed conditions in Mauritania. Mr. Sarr timely appealed to this Court.

## II. DISCUSSION

**A. Establishing Eligibility for Asylum or Withholding of Removal**

A deportable alien may seek to remain in the United States by demonstrating that he qualifies for one or more of three statuses: asylum under 8

8

U.S.C. § 1158, withholding of removal under 8 U.S.C. § 1231(b)(3)(A), or relief under the Convention Against Torture, *see* Pub. L. No. 105-277, § 2242, 112 Stat. 2681, 2681-822–23 (1998); 8 U.S.C. § 1231 (note). To qualify for asylum, an alien must show that he "has suffered past persecution or has 'a well-founded fear of [future] persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Tulengkey v. Gonzales*, 425 F.3d 1277, 1280 (10th Cir. 2005) (alteration in original) (quoting 8 U.S.C. § 1101(a)(42)(A) and citing 8 C.F.R. § 208.13(a)). To qualify for restriction on removal, an alien must demonstrate that his "life or freedom would be threatened in [the proposed country of removal] because of [his] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A); *see also* 8 C.F.R. § 1208.16(b). Protection under the CTA does not depend on a showing that mistreatment would be based on any particular characteristic (e.g. race or political opinion), but an alien seeking such relief must show that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2).

**B. Standard of Review**

When reviewing BIA decisions, an appellate court must "look to the record for 'substantial evidence' supporting the agency's decision: '[O]ur duty is to guarantee that factual determinations are supported by reasonable, substantial and probative evidence considering the record as a whole.'" *Uanreroro v. Gonzales*,

9

443 F.3d 1197, 1204 (10th Cir. 2006) (alteration in original) (quoting *Elzour v. Ashcroft*, 378 F.3d 1143, 1150 (10th Cir. 2004)).  Agency findings of fact are "conclusive unless the record demonstrates that any reasonable adjudicator would be compelled to conclude to the contrary."  *Sviridov v. Ashcroft*, 358 F.3d 722, 727 (10th Cir. 2004) (citing 8 U.S.C. § 1252(b)(4)(B)) (other internal citations and quotation marks omitted).  We do not "weigh the evidence or . . . evaluate the witnesses' credibility."  *Woldemeskel v. INS*, 257 F.3d 1185, 1189 (10th Cir. 2001) (internal citations and quotation marks omitted).

"Credibility determinations are factual findings . . . subject to the substantial evidence test."  *Uanreroro*, 443 F.3d at 1204.  "Because an alien's testimony alone may support an application for withholding of removal or asylum, 8 C.F.R. § 208.13(a), the IJ must give specific, cogent reasons for disbelieving it."  *Sviridov*, 358 F.3d at 727 (internal citation and quotation marks omitted).  In formulating those reasons, the trier of fact must look to the "totality of the circumstances" and "all relevant factors."  8 U.S.C. § 1158(b)(1)(B)(iii).

**C. Scope of Review**

Review in this case is complicated by the fact that there exists both an oral decision of the immigration judge and a written decision by a member of the BIA. These two decisions are not identical.  The IJ decision relies upon some factors not mentioned by the BIA order, and the BIA order takes issue with the IJ's decision in one potentially important respect.  Mr. Sarr contends that our review

10

should be limited to the BIA opinion. The government, on the other hand, would have us look to both the BIA opinion and the IJ's opinion to determine whether the removal order satisfies our standard of review. To resolve this dispute, we turn to general principles of administrative law and to our recent precedent detailing the asylum process and our role within it.

Asylum applicants receive a hearing before an immigration judge, at which the applicant has the burden of proving refugee status. 8 C.F.R. § 1208.13(a); *Nazaraghie v. INS*, 102 F.3d 460, 462 (10th Cir. 1996). If the IJ's ruling is adverse to the applicant, he may seek review by the BIA. 8 U.S.C. § 1229a(c)(5); 8 C.F.R. § 1240.15; 8 C.F.R. §§ 1003.1(b)(3), 1003.38. If the BIA ruling is adverse to the applicant, he may seek review in this Court. "We have general jurisdiction to review only a 'final order of removal,' 8 U.S.C. § 1252(a)(1), and there is no 'final order of removal' until the BIA acts." *Uanreroro*, 443 F.3d at 1203 (quoting *Cruz-Funez v. Gonzales*, 406 F.3d 1187, 1190 (10th Cir. 2005)).

Until 1999, all appeals to the BIA were decided by three-member panels whose opinions constituted the final decision of the agency. Pursuant to regulations promulgated by the Attorney General in 1999 and 2002, the BIA now has three options: decision by a three-member panel with a full explanatory opinion, 8 C.F.R. § 1003.1(e)(6), summary affirmance by a single member of the board without opinion, *id.* § 1003.1(e)(4), or decision via a brief order by a single member of Board, affirming, modifying, or remanding the IJ's decision, *id.* §

11

1003.1(e)(5). *See also Uanreroro,* 443 F.3d at 1203–04; *Tsegay v. Ashcroft*, 386 F.3d 1347, 1351–52 (10th Cir. 2004).

Our scope of review depends upon which of these three forms the BIA decision takes. If a three-member panel issues a full explanatory opinion, which it does in a "particularly difficult or important case," the "BIA opinion completely supercedes the IJ [opinion] for purposes of [judicial] review." *Uanreroro*, 443 F.3d at 1203 (citing 8 C.F.R. § 1003.1(e)(6); 67 Fed. Reg. 54878, 54,886 n.6 (Aug. 26, 2002)). If a single member of the BIA issues a summary affirmance without opinion, which occurs in "more routine appeal[s]," *id.*, the IJ opinion constitutes the decision of the agency for purposes of appeal and the reviewing court looks to that opinion to determine the agency's rationale. *Id.* at 1203; *Yan v. Gonzalez*, 438 F.3d 1249, 1251 (10th Cir. 2006); *Sviridov*, 358 F.3d at 727. Such an affirmance does not imply BIA approval of all the reasoning in the IJ opinion, but does signify that any potential errors are harmless or nonmaterial. *Uanreroro*, 443 F.3d at 1203; 8 C.F.R. § 1003.1(e)(4)(ii).

"If the case is more significant than an (e)(4) case and less significant than an (e)(6) case," *Cruz-Funez*, 406 F.3d at 1190, a single BIA member can decide the merits of the appeal and issue "a brief order, affirming, modifying, or remanding" the IJ's order, 8 C.F.R. § 1003.1(e)(5). Such an order is a "middle ground . . . between the full opinion and summary affirmance options." *Uanreroro*, 443 F.3d at 1203-04. In *Uanreroro* we held that such an order

12

constitutes "the final order of removal under 8 U.S.C. § 1252(a)," and thus the Court "will not affirm on grounds raised in the IJ decision unless they are relied upon by the BIA in its affirmance." 443 F.3d at 1203–04. We noted, however, that "when seeking to understand the grounds provided by the BIA, we are not precluded from consulting the IJ's more complete explanation of those same grounds." *Id.* at 1204. In other words, because an (e)(5) affirmance is, by definition, a truncated process which can rest on what has been said below, we may consult the IJ's opinion to the extent that the BIA relied upon or incorporated it.

*Uanreroro* identified three general circumstances that call for consultation of the IJ opinion: (1) "where the BIA incorporates by reference the IJ's rationale," (2) where the BIA "repeats a condensed version of [the IJ's] reasons while also relying on the IJ's more complete discussion," and (3) "where the BIA reasoning is difficult to discern and the IJ's analysis is all that can give substance to the BIA's reasoning." *Id.* The first two categories are obvious and easily applied. Where the BIA explicitly incorporates the IJ's reasoning, we review it. The last category, however, requires more delicate analysis. Where the BIA does not explicitly incorporate or summarize the IJ's reasoning, but its opinion is opaque or otherwise unclear, we may look to the IJ's opinion for guidance on the theory that the BIA did the same. *See, e.g., Cruz-Funez*, 406 F.3d at 1191

13

(consulting an IJ opinion in the face of a "somewhat mystifying" (e)(5) order). But as we cautioned in *Uanreroro*, this category is not an open invitation to turn to the IJ's opinion in every instance. Where the BIA decision does not explicitly incorporate or summarize the IJ's reasoning and "contains a discernible substantive discussion" that stands on its own, "our review extends no further . . . ." *Uanreroro*, 443 F.3d at 1204. Simply put, the task is to determine whether, in issuing an order under the (e)(5) process, the BIA incorporated the IJ's reasoning, either expressly or by implication. Only then may we impute the IJ's opinion to the BIA.

The government argues for a more expansive consideration of the IJ's opinion. But the principles of appellate review stated above are not an artificial creation of this Court. They rest on a fundamental principle of administrative law, announced by the Supreme Court nearly sixty years ago:

> [A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). In *INS v. Ventura*, 537 U.S. 12 (2002) (per curiam), the Supreme Court stressed that these principles of limited appellate review have "obvious importance in the immigration context." *Id.* at

14

16-17. By refraining from deciding immigration appeals on the basis of grounds not expressly or impliedly adopted by the BIA, "we safeguard agency decision making by ensuring that the agency itself makes the decisions entrusted to its authority based on grounds articulated by that entity." *Mickeviciute v. INS*, 327 F.3d 1159, 1165 (10th Cir. 2003). Our procedures for judicial review respect the BIA's discretionary decision to adopt the IJ's opinion in part or in whole (or not at all). In a particular case, government lawyers may find it convenient for us to expand the scope of our review to include portions of the IJ's opinion that were not explicitly or implicitly adopted by the BIA, but that would come at the cost of respect for the agency's own judgment regarding its ground for decision.

In seeking a broader role for the IJ's opinion in the context of judicial review of an (e)(5) order, the government directs our attention to the explanation of the (e)(5) process in the preamble to the 2002 regulations:

> As discussed below, § 3.1(e)(5) also authorizes a single Board member to enter a decision that modifies the immigration judge's decision or remands the case to the immigration judge in any case that does not meet the standards for three-member panel review under § 3.1(e)(6). Such an opinion may properly begin with the opinion of the immigration judge and make specific modifications to that opinion. For example, a single-member opinion may state that the Board member "adopts the opinion of the immigration judge, except to note that" a particular issue is governed by intervening precedent, and to explain that the immigration judge's opinion would still be correct in light of the intervening precedent. Accordingly, such an opinion would conclude that the "immigration judge's opinion is affirmed for the reasons set forth therein and as set forth in this opinion." *In this instance, the parties and any reviewing court would be able to look to the combination of the immigration*

15

*judge's opinion and the single-member decision to understand the conclusions reached in the adjudication.*

67 Fed. Reg. 54878, 54886 n.6 (Aug. 26, 2002) (emphasis added). We do not think the preamble supports the government's position. The government calls particular attention to the italicized last sentence, but that sentence does not suggest that the reviewing court should look to "the combination of the immigration judge's opinion and the single-member decision" in every case; rather, it suggests that such a procedure is appropriate only when the single-member opinion expressly adopts the IJ's opinion except in some particular respect. Our approach is entirely consistent with this explanation.

In this case, the BIA proceeded under 8 C.F.R § 1003.1(e)(5), and we will review its opinion in accordance with the principles outlined above.

### D. Application

In a three-paragraph order, a single member of the BIA proceeded under the (e)(5) process and affirmed the IJ's denial of Mr. Sarr's petitions. In the first paragraph, the BIA stated that after "review[ing] the record of the proceeding, the Immigration Judge's decision," and Mr. Sarr's contentions on appeal, it "agree[d] with the Immigration Judge" that Mr. Sarr "failed to carry his burden of proof to demonstrate his actual identity, and did not establish either past persecution or a well-founded fear of future persecution." Admin. R. at 2. Although the BIA did not explicitly state in what respect Mr. Sarr failed to carry his burden of proof, we

16

assume that the problem was with his proof of identity. The principal focus of the litigation before the IJ was on Mr. Sarr's birth certificate, which was his only documentary evidence of Mauritanian citizenship. Although the certificate withstood the government's forensic examination and was consistent with Mr. Sarr's own testimony regarding his place of birth and early residence, Mr. Sarr was unable to offer any confirmation of his identity from Mauritanian authorities. The IJ questioned the authenticity of the birth certificate on the basis of Mr. Sarr's account of the destruction of most of the family's documents.

The BIA did not expressly adopt any part of the IJ's opinion. In the second and third paragraphs of its opinion, the BIA responded to Mr. Sarr's arguments on appeal. Only the second paragraph relates to issues on appeal to this Court. That paragraph is addressed to Mr. Sarr's contentions that the IJ's decision "was based on an inaccurate assessment of [Mr. Sarr's] testimony regarding his ability to produce a birth certificate and on an inconsequential inability to remember the year in which his mother died." *Id.* at 2. The BIA agreed with Mr. Sarr that the IJ's "decision did not completely describe [Mr. Sarr's] testimony with relation to the birth certificate at issue, namely by failing to mention [Mr. Sarr's] statement (Tr. at 14) that his mother had preserved one document." *Id.* Notwithstanding this error, the BIA declined to find the IJ's ultimate adverse credibility finding clearly erroneous, on the ground that Mr. Sarr "made contradictory statements with regard to the central issue of the alleged destruction of his family's

17

documents and the issue of when his mother, who he claimed successfully preserved at least one family document, passed away." *Id.* at 2–3.

The BIA thus modified the grounds on which the IJ reached his adverse credibility determination. A finding that testimony is "not sufficiently detailed" obviously cannot be sustained when the IJ failed even to acknowledge relevant portions of that testimony, namely, Mr. Sarr's testimony regarding his mother's preservation of his Mauritanian birth certificate. The BIA affirmed the IJ's adverse credibility finding solely on the basis of the inconsistency in Mr. Sarr's testimony regarding two issues—the preservation of the birth certificate and the date of Mr. Sarr's mother's death.[6]

Perhaps recognizing that the supposed inconsistency in Mr. Sarr's testimony on these matters is less than met the BIA's eye, the government asks us to disregard the BIA's specific ruling and expand our review to include the IJ's rationale that Mr. Sarr's testimony was "not believable" or "improbable." The government contends that the "fact that the IJ and the Board labeled Sarr's

---

[6] The BIA made no reference to the third reason the IJ gave for finding Mr. Sarr not credible: his lack of knowledge of his Dakar employer's address or phone number and failure to contact him. Because the BIA did not expressly or impliedly incorporate this rationale into its opinion, we do not address it. Even if we did, it would not change the outcome of this appeal. The transcript of Mr. Sarr's hearing before the IJ does not reveal that he was asked for the address or phone number of his employer, nor was he asked whether he had attempted to contact the employer or, if not, why not. The sum total of Mr. Sarr's testimony regarding his employer in Dakar was three sentences, with no follow-up questions and no questions on cross-examination. *See id.* at 90.

18

statements regarding the preservation of his birth certificate as 'inconsistent,' as opposed to 'improbable,' is of no consequence—either can be the basis for an adverse credibility finding."  Brief for Respondent at 35.  Surely not.  Inconsistency and improbability are two different things.  Our review of the BIA decision must be confined to the ground identified by the BIA: the supposed inconsistencies in Mr. Sarr's testimony.

1. *Inconsistency Regarding the Birth Certificate.*

The first purported inconsistency discussed by the BIA concerns Mr. Sarr's testimony as to the fate of his birth certificate.  The BIA recognized that Mr. Sarr offered an explanation for this seeming inconsistency and stated that the IJ did not "completely describe" this explanation.  Admin. R. at 2.  The BIA concluded, however, that "the record reflects that the respondent made contradictory statements with regard to the central issue of the alleged destruction of his family's documents . . . ."  *Id.*  The BIA provided no further discussion as to what these inconsistencies were and provided no citation to the record.  We are thus left to consult the IJ's more complete discussion and the record itself.  As to this issue, the IJ found the following:

> [R]espondent has . . . testified . . . [t]hat his father brought out the paperwork regarding the family and that the soldiers destroyed all of the paperwork.  That nothing was available.  Now, all of a sudden, he comes up with a birth certificate.  From where, I have no idea other [than] what he said, the mother had it on her.  Well, according to what [he told] us previously, . . . the father had it and handed it to the soldiers and they destroyed all of the paperwork and . . . there was

19

nothing left there.

*Id.* at 54–55.

A review of the record suggests that the IJ and the BIA significantly overemphasize the inconsistent nature of Mr. Sarr's statements. In his Form I-589 asylum application, Mr. Sarr said only this regarding the documents: "[The soldiers] spoke with my father and ordered him to identify himself and also his family members to be Mauritanian citizens. He entered his room and came out with few documents and gave them. After they looked at the documents, they tore the documents and threw the pieces away." *Id.* at 175. At the hearing before the IJ, Mr. Sarr discussed the document destruction three times:

First, at the beginning of the hearing, counsel asked Mr. Sarr how the birth certificate escaped destruction by the soldiers. Mr. Sarr responded:

> My mother was holding [my birth certificate]. My mother had all the papers. When they came they asked the papers to my father so my father requested that my mother bring them out and she brought everything but this last one that remained with the other papers that were there.

*Id.* at 79. He further explained that mores in the Islamic country of Mauritania accounted for the soldiers' failure to search the mother and children. *Id.* at 80.

During the second discussion of the documents, the following exchange occurred:

Q: What did the soldiers want from your father?

A: They asked him to prove that he was a Mauritanian citizen.

20

Q: Did he?  What did he do about it?

A: When they asked him that they requested that he brings [sic] all his paperwork.  That's when he went to my mom and requested that she give him all our paperwork.

Q: Did he end up giving them away or not?

A: Yes.

Q: What did they do with them?

A: He looked at the paperwork and then he destroyed it.

*Id.* at 82.

The third piece of testimony regarding the paperwork consisted of the following:

Q: . . . How did the soldiers destroy your family paperwork?

A: This is how, the paper it has my father's certificate of nationality, his ID, his passport, and then my siblings and everybody else paperwork, certificate.  And my father gave it to them hoping that this will save him but they took it and they torn it.  It was torn.

*Id.* at 101.

As the BIA conceded, the IJ failed to describe fully Mr. Sarr's explanation of how his mother retained the birth certificate.  At first, in response to a *specific* question about *his* birth certificate, Mr. Sarr said his mother had retained it.  Later, in response to more *general* questions about the *family's* paperwork, he said all of it was destroyed.  Although Mr. Sarr's later statements contain some language about "all" the paperwork and "everybody else['s] paperwork" being

21

destroyed, these statements were made through a translator and in the shadow of the very specific explanation given at the outset of the questioning on this topic. Taking into account the fact that this colloquy occurred through a translator—and given that the very first thing Mr. Sarr explained about his birth certificate was its absence from the group of destroyed papers—this testimony does not appear contradictory. In the context of all that unfolded at this hearing—and in the context of the concerns this Court has previously raised regarding the testimony of asylum applicants, *see Solomon v. Gonzales*, 454 F.3d 1160, 1164 (10th Cir. 2006)[7]—there is no direct inconsistency in Mr. Sarr's statements, and there is no apparent inconsistency in their substance. As for any other "contradictory statements with regard to . . . the alleged destruction of his family's documents,"

---

[7] In *Solomon* we observed:

> The courts of appeals have frequently noted the inherent problems with credibility determinations in asylum cases. Asylum applicants rarely speak English, and their testimony is plagued with the uncertainties of translation and cultural misunderstanding. They are generally unfamiliar with American procedures and wary of lawyers and officials; often they are not well served even by their own legal counsel. Their escape from persecution sometimes entailed acts of deceit and prevarication, or even bribery or forgery, which complicates evaluation of their veracity in immigration proceedings. Moreover, because of their troubled relations with their native countries, purported refugees often have difficulty in obtaining documentation to back up their claims.

*Id*. at 1164 (internal citation omitted).

22

the BIA failed to point this Court to any and our independent review of the record has revealed none.

2. *Inconsistency Regarding the Date of the Death of Mr. Sarr's Mother*

The BIA also stated that "the record reflects that [Mr. Sarr] made contradictory statements with regard to . . . the issue of when his mother, who he claimed successfully preserved at least one family document, passed away." Admin. R. at 2–3. For its part, the IJ's opinion adds little substance to this discussion. As a reason for disbelieving Mr. Sarr, the IJ pointed out that Mr. Sarr "indicated to the Court that his mother died in 1994 but this afternoon when he was asked again he said 1991, then he said 1994." *Id.* at 55.

Mr. Sarr discussed his mother's death at three different points during the hearing. The first mention came while Mr. Sarr was discussing the difficulties of life in the refugee camp:

Q: What happened with your mother?

A: While we were there life was very difficult . . . . And my mother was with a lot of pain because of everything that happened and I think she died, you know, as a result of all these things.

Q: When did she die?

A: She died in 1994.

*Id.* at 89. The second discussion of his mother's demise entailed a fairly detailed account of the circumstances surrounding the death, but no specific date was asked for or offered. *Id.* at 98–99. The third discussion of his mother's death

23

was the subject of some confusion between the court, the lawyers, and the interpreter. It began with Mr. Sarr's lawyer, Ms. Healy, asking Mr. Sarr again to discuss his mother's death:

> Q: Alassane, at our last hearing there were some questions with regard to the death of your mother and that's what I wanted to ask you about. Can you tell me what year your mother died in?
>
> A: (No audible response.)

*Id.* The IJ then interjected and the following colloquy occurred between him and Ms. Healy:

> [IJ]: 1994 according to what he said.
>
> [Ms. Healy]: Okay.
>
> [IJ]: So it's been asked and answered, so.

*Id.* at 119–20. Without further prompting, Mr. Sarr (through his translator) said:

> In 1991. She got very sick and this was a result of the past thing that happened to us. I was out and when I came back I found her. Again she had relapsed. We took her to the Red Cross and she had office visit there and she was given some pills to take. And we went home and in the afternoon a little bit after 3:00 that's when she died.

*Id.* at 120. Ms. Healy then turned to the IJ and had the following discussion:

> [Ms. Healy]: And because there was some confusion can I ask again when she died?
>
> [IJ]: No.
>
> [Ms. Healy]: Okay.
>
> [IJ]: She [Mr. Sarr's interpreter] said 1991.

24

[Ms. Healy]: Okay.

[IJ]: That's not what he told me last time.

[Ms. Healy]: 1991, okay.

[IJ]: That's what he said. The last time he told me 1994. That's what I have in my notes.

[Ms. Healy]: Right, that's what I have too and so I want to make sure that it was clear because I'm not sure the stories –

[IJ]: Well, I got the answer already so.

[Ms. Healy]: Okay.

*Id.* at 120–21. Seven questions later, Ms. Healy asked Mr. Sarr what his family painted on his mother's grave marker. He answered: "Her name, the date that she died." *Id.* at 122. The IJ then directly addressed Mr. Sarr:

Q: Tell me what the date is again.

A: I do not remember the exact date but I remember the year.

Q: Tell me what it is.

A: 1994.

Q: Okay.

*Id.* at 122.

In view of this evidence, two things are evident. First, although there was some confusion as to Mr. Sarr's response (perhaps due to translation issues), Mr. Sarr did, momentarily, contradict himself as to the date of his mother's death. Second, that contradiction was a minor discrepancy that Mr. Sarr quickly

25

corrected. Because the date of his mother's death made no difference to the strength or plausibility of his story, he had no incentive to change or reshape his testimony on this point. We do not believe this minor mistake constitutes substantial evidence upon which an adverse credibility finding can be based. In *Diallo v. Gonzales*, 447 F.3d 1274, 1283 (10th Cir. 2006), this Court affirmed an adverse credibility finding where the petitioner "was given the opportunity to explain . . . inconsistencies but failed to do so to the IJ's satisfaction." Here, by contrast, Mr. Sarr was given no opportunity to explain, and the inconsistency is far less significant than that in *Diallo*.

Aside from the lone misstep as to the year, Mr. Sarr's testimony regarding his mother's death was reasonably detailed and consistent. Moreover, the BIA seems to have linked the inconsistency about the date of his mother's death (a point that has little to do with his request for asylum) with the validity of the birth certificate (a point that has much to do with his request for asylum), *see* Admin. R. at 3 ("[R]espondent made contradictory statements with regard to . . . the issue of when his mother, who he claimed successfully preserved at least one family document, passed away.")—a jump that has no logical foundation since, under either date, Mr. Sarr's mother would have been alive at the time of the document destruction.

### III. CONCLUSION

We hold that the decision to deny Mr. Sarr's requested relief was not supported by substantial evidence. Mr. Sarr presented proof of his Mauritanian citizenship through both documentary and testimonial evidence. The government concedes that it subjected Mr. Sarr's Mauritanian birth certificate to forensic examination and found that it had not been altered. Mr. Sarr also testified that he was born in Mauritania, that his family resided and owned property in Mauritania, and that he lived there until his expulsion at the age of thirteen. As we have previously noted, "an asylum applicant's otherwise credible testimony constitutes sufficient evidence to support an application," *Solomon*, 454 F.3d at 1165, and while the agency is entitled to disbelieve such testimony, it must have "specific, cogent reasons" for doing so, *Sviridov*, 358 F.3d at 727 (internal quotation marks and citation omitted). It is quite possible that such reasons exist in this case, but the BIA failed to identify them, either in its own opinion or through incorporation of the IJ's opinion. The BIA concedes that the IJ's analysis of Mr. Sarr's testimony was incomplete. It upheld the IJ's adverse credibility finding based upon two inconsistencies that, if they existed at all, were too minor to constitute substantial evidence. We thus REVERSE the decision of the BIA and REMAND to the agency for further proceedings. On remand, the agency may consider additional evidence regarding Mr. Sarr's Mauritanian identity and may consider alternative grounds, including any possible change in country conditions.