**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**May 22, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

INDRA PANJAITAN,

    Petitioner,

v.

ALBERTO R. GONZALES, United
States Attorney General,

    Respondent.

No. 06-9562
(No. A97-195-877)
(Petition for Review)

---

**ORDER AND JUDGMENT**[*]

---

Before **LUCERO**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and
**McCONNELL**, Circuit Judge.

---

    Petitioner Indra Panjaitan, a citizen of Indonesia, entered the United States

as a visitor and failed to depart upon expiration of his visa. In removal

proceedings he conceded removablility but sought asylum, restriction on removal,

---

[*]    After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and
collateral estoppel. It may be cited, however, for its persuasive value consistent
with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

and relief under Article III of the United Nations Convention Against Torture (CAT). An immigration judge (IJ) denied his asylum application as untimely because it was filed over one year from his entry into the United States. The IJ also found that Mr. Panjaitan did not qualify for either of two exceptions to the one-year time limit–for "changed circumstances" or "extraordinary circumstances"–found in INA § 208(a)(2)(D), 8 U.S.C. § 1158(a)(2)(D). The IJ denied his applications for restriction on removal and relief under Article III of the CAT for failure of proof.

Mr. Panjaitan appealed to the Board of Immigration Appeals (BIA), arguing that the IJ erred in denying his asylum application as untimely because he had established "extraordinary circumstances." He also argued that the IJ erred in ruling that he had not adequately proven past persecution or that it was more likely than not that he would suffer future persecution on account of his Christian beliefs. The BIA adopted and affirmed the IJ's decision regarding his applications for asylum and restriction on removal.[1]

### DISCUSSION

In his petition to this Court, Mr. Panjaitan raises six points of error: (1) the IJ and the BIA erred in finding his asylum application was untimely because he qualified for the "changed circumstances" and "extraordinary circumstances"

---

[1] The BIA found that there was no meaningful challenge on appeal regarding the IJ's denial of relief under Article III of the CAT.

exception to the one-year time limit; (2) the BIA erred in affirming the IJ's determination that Mr. Panjaitan failed to prove past persecution because the IJ failed to make such a determination; (3) the BIA erred in affirming the IJ's determination that Mr. Panjaitan failed to prove past persecution; (4) the BIA erred in affirming the IJ's determination that Mr. Panjaitan failed to prove that he had a well-founded fear of future persecution; (5) the BIA erred in affirming the IJ's determination that Mr. Panjaitan was not eligible for restriction on removal under INA § 241(b)(3), 8 U.S.C. § 1231(b)(3); and (6) the BIA erred in determining that Mr. Panjaitan had not challenged the IJ's denial of protection under Article III of the CAT on appeal to the BIA. We deny his petition because we have no jurisdiction to review the BIA's determination that his asylum application was untimely, because there was substantial evidence supporting the BIA's denial of restriction on removal, and because we have no jurisdiction to review a claim regarding relief under Article III of the CAT that was not first presented to the BIA.

## I. Scope and Standard of Review

The BIA issued its decision by a brief order by a single member of the Board affirming and adopting the IJ's decision. *See* 8 C.F.R. § 1003.1(e)(5). We therefore review the BIA's decision as the final order of removal but "may consult the IJ's opinion to the extent that the BIA relied upon or incorporated it." *Sarr v. Gonzales*, 474 F.3d 783, 790 (10th Cir. 2007).

When reviewing BIA decisions, an appellate court must look to the record for 'substantial evidence' supporting the agency's decision[.] Our duty is to guarantee that factual determinations are supported by reasonable, substantial and probative evidence considering the record as a whole. Agency findings of fact are conclusive unless the record demonstrates that any reasonable adjudicator would be compelled to conclude to the contrary. We do not weigh the evidence or evaluate the witnesses' credibility.

*Id*. at 788-89 (citations, internal quotation marks, and alterations omitted).

## II. Establishing Eligibility for Asylum or Restriction on Removal

A deportable alien may seek to remain in the United States by demonstrating that he qualifies for one or more of three statuses: asylum under 8 U.S.C. § 1158, withholding of removal under 8 U.S.C. § 1231(b)(3)(A), or relief under the [CAT], *see* Pub.L. No. 105-277, § 2242, 112 Stat. 2681, 2681-822-23 (1998); 8 U.S.C. § 1231 (note). To qualify for asylum, an alien must show that he "has suffered past persecution or has 'a well-founded fear of [future] persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Tulengkey v. Gonzales*, 425 F.3d 1277, 1280 (10th Cir. 2005) (alteration in original) (quoting 8 U.S.C. § 1101(a)(42)(A) and citing 8 C.F.R. § 208.13(a)). To qualify for restriction on removal, an alien must demonstrate that his "life or freedom would be threatened in [the proposed country of removal] because of [his] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A); *see also* 8 C.F.R. § 1208.16(b). Protection under the CTA does not depend on a showing that mistreatment would be based on any particular characteristic (e.g. race or political opinion), but an alien seeking such relief must show that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2).

*Id*. at 788.

## III. Discussion

### A. Mr. Panjaitan's Points 1-4: Asylum

Under § 1158(a)(2)(B), an alien may not apply for asylum "unless the alien demonstrates by clear and convincing evidence that the application has been filed within 1 year after the date of the alien's arrival in the United States." There is no dispute that Mr. Panjaitan did not meet this one-year time limit. He argues in his first point, however, that he met one of the exceptions to the time limit found in § 1158(a)(2)(D).

We agree with the government that this court has no jurisdiction to review this point of error. Section § 1158(a)(3) specifically instructs that "[n]o court shall have jurisdiction to review any determination of the Attorney General under paragraph (2)." Mr. Panjaitan presents no argument on how this court may ignore such an explicit directive. Although, "[w]ith Congress' passage of the Real ID Act, we now have jurisdiction to review constitutional claims and questions of law, 8 U.S.C. § 1252(a)(2)(D)," Mr. Panjaitan's argument to the BIA that his inability to speak English and his unfamiliarity with United States' immigration law qualified as an "extraordinary circumstance," is a "challenge[] directed solely at the agency's discretionary and factual determinations [and] remains outside the scope of judicial review." *Ferry v. Gonzales*, 457 F.3d 1117, 1130 (10th Cir. 2006) (internal quotation marks omitted). Since we have no jurisdiction to review the BIA's determination that Mr. Panjaitan's asylum application was untimely, we

dismiss as moot his second, third, and fourth points which address the grounds for granting asylum.

B. Mr. Panjaitan's Point 5: Restriction on Removal Under 8 U.S.C. § 1231(b)(3)(A)

Section 1231(b)(3)(A) reads in pertinent part: "the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." "The restriction statute is satisfied by a showing that it is more likely than not that the alien would be subject to persecution on one of the specified grounds upon returning to [his] country of origin." *Tulengkey*, 425 F.3d at 1280 (quotation omitted). "It is therefore more demanding than the 'well-founded fear' standard applicable to an asylum claim." *Elzour v. Ashcroft*, 378 F.3d 1143, 1149 (10th Cir. 2004) (quotation omitted).

The evidence in this case consisted mainly of Mr. Panjaitan's testimony, which the IJ found to be credible. Mr. Panjaitan was born in the small, mostly Christian, Indonesian village called Sipahuta. He is a Seventh Day Adventist and lived in Sipahuta until he graduated from high school. During his time in Sipahuta there were only a few incidents between Muslims and Christians because "[t]here was no major opposition [from] the Muslims at that time." Admin. R. at 81.

After high school he moved to Jakarta and got married. Relations between Muslims and Christians were still "relatively peaceful" during the time he lived in Jakarta. *Id*. In 1979, Mr. Panjaitan began working at a bank. His life remained peaceful for approximately the next nine years until "general changes started to happen in 1998 when the students wanted a different government." *Id*. at 83. At that point in time Mr. Panjaitan was living in "Bandalampong" and "things changed and became quite disorganized." *Id*. Mr. Panjaitan testified that "[p]hysically actually nothing happened to me, but in that particular time in Bandalampong, there were a lot of Muslim extremists who caused a lot of businesses to go down and one of them was my bank." *Id*. at 84. According to Mr. Panjaitan, the rise in Muslim extremism caused a lot of businesses to flee the country and the departure of these business adversely affected the banking industry due to the loans that subsequently went unpaid. He took a pension and retired in February of 2000. He then left Indonesia, arriving in the United States in December of 2000. The bank was taken over by "a conglomerate" and was still in operation at the time of the hearing. *Id*. at 85.

Mr. Panjaitan testified that another reason for coming to the United States was that he was afraid that his son "wouldn't be able to go to the university." *Id*. Nevertheless, he later testified that at the time of the hearing his family still lived in Indonesia, his oldest son was 25 and had "just graduated recently from the university" with a law degree, his second son was 23 and had "also just graduated

-7-

in management," and his third son was "in first grade in senior high." *Id*. at 109-10.

Mr. Panjaitan testified that there were Muslim extremists in the area where he lived and that "they shout Allah Akbar, all the time and they tell people that if you are able to kill a non-believer, a person that does not belong to Muslims, then you will go to heaven and what they mean is . . . Christians." *Id*. at 84. Mr. Panjaitan's testimony was basically that there was a rise in Muslim extremism and that he was afraid that if the extremists were able to take over the government it would cause a lot of problems for his family. As to specific instances of persecution, he testified that a church was burnt near his house and that "they show a lot of [physical persecution by extremists] on TV. *Id*. at 88. Nothing ever happened to him physically, but stones had been thrown at a building where he and other church members were holding meetings. He testified that when the church celebrated Christian holidays it had to be done quietly and under guard by the police. According to Mr. Panjaitan, his children had at times had anti-Christian insults shouted at them while coming home from school. But despite his fear he admitted that "if I had to go home, I actually think that I'm not as afraid as I used to be, but my life would be difficult because the economy is still very bad." *Id*. at 97. He also testified:

> I would say physically I'm not as afraid because there are ways to
> avoid them, to run away from them, to not confront them but
> mentally it would be extremely difficult because I would be

surrounded by Muslims and they would have this pressure on me, on my behavior, so that would be very hard.

*Id*.

"Persecution is the infliction of suffering or harm upon those who differ (in race, religion, or political opinion) in a way regarded as offensive, and requires more than just restrictions or threats to life and liberty." *Tulengkey*, 425 F.3d at 1280 (quotation omitted). Mr. Panjaitan had the burden of proof of showing that it was more likely than not that he would be persecuted on account of his Christian religion if he returned to Indonesia. The BIA adopted the IJ's determination that Mr. Panjaitan had not met his burden of proof on his restriction on removal claim. While the evidence shows some harassment and that the rise in Muslim extremism has caused increased problems for Christians, Mr. Panjaitan's family still lives in Indonesia and there was little evidence presented of their persecution. In fact, his two oldest children had just graduated from university, one with a law degree. Consequently, we hold that the BIA's denial of restriction on removal was supported by substantial evidence because from this record it is impossible to say that all reasonable adjudicators would be compelled to conclude to the contrary.[2]

_____

[2]    In his second point, Mr. Panjaitan complains that the IJ failed to make an adequate factual finding as to whether he suffered past persecution. We recognize that even though restriction on removal (unlike asylum) may not be granted solely on the basis of past persecution, this argument has some relevance to the IJ's denial of restriction on removal since "[i]f the applicant is determined

(continued...)

C.  Mr. Panjaitan's Point 6.  Relief Under Article III of the CAT

In his sixth point, Mr. Panjaitan argues that he raised the issue of the IJ's denial of relief under Article III of the CAT before the BIA and the BIA erred in no addressing his claim of error.  Mr. Panjaitan argues:

> In his brief to the BIA, counsel for [Mr. Panjaitan] writes, "The Petitioner based his claim to asylum on his ethnicity and religious affiliation and convention against torture."  Thus by this written statement, [Mr. Panjaitan] has made it clear to the BIA that he did not waive any challenge to the IJ's conclusion that he Indra is ineligible for CAT.

Pet. Opening Br. at 17 (citation omitted).  The statement cited by Mr. Panjaitan is from the statement of facts in his BIA brief.  This is not a reasoned argument.  "The failure to raise an issue on appeal to the Board constitutes failure to exhaust administrative remedies with respect to that question and deprives the Court of

---

[2](...continued)
to have suffered past persecution in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion, it shall be presumed that the applicant's life or freedom would be threatened in the future in the country of removal on the basis of the original claim."  8 C.F.R. § 208.16(b)(1)(I).

Nevertheless, even if we considered this argument properly raised as to Mr. Panjaitan's denial of restriction, it would be denied.  First, Mr. Panjaitan never argued to the BIA that the IJ failed to make a finding as to past persecution.  *See* Admin. R. at 11 (showing that Mr. Jaitan's second issue on appeal before the BIA was "[w]hether the [IJ] erred when *he held that while [Mr. Panjaitan] has not shown past persecution*, he did not feel that [Mr. Panjaitan] met the high burden of showing that it is more likely [than not] that he would be subject to persecution or torture." (emphasis added)).  Second, Mr. Panjaitan has not directed us to any authority supporting a proposition that it is reversible error for an IJ not to make a specific finding as to past persecution when denying an application for restriction on removal.

-10-

Appeals of jurisdiction to hear the matter." *Akinwunmi v. INS*, 194 F.3d 1340, 1341 (10th Cir. 1999) (per curiam) (internal quotation marks omitted); *De La Cruz v. Maurer*, ___ F.3d ___, 2007 WL 970166, at *2 (10th Cir. April 3, 2007) ("[W]e have jurisdiction only over those claims that were presented to the BIA and were properly appealed to this court . . . .").

## CONCLUSION

Mr. Panjaitan's petition for review is therefore DENIED.

Entered for the Court

Michael W. McConnell
Circuit Judge