**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 28, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

ANGGIA SIBUEA; SUSY
WIDJAJANTI,

       Petitioners,

v.

MICHAEL B. MUKASEY,[*]
Attorney General,

       Respondent.

No. 07-9508
(Petition for Review)

---

**ORDER AND JUDGMENT**[**]

---

Before **KELLY**, **PORFILIO**, and **ANDERSON**, Circuit Judges.

---

Petitioners Anggia Sibuea and Susy Widjajanti, a husband and wife who are

natives and citizens of Indonesia, petition for review of a decision by an

Immigration Judge ("IJ"), affirmed by the Board of Immigration Appeals

---

[*]     Pursuant to Fed. R. App. P. 43(c)(2), Michael B. Mukasey is substituted for
Alberto R. Gonzales as respondent in this appeal.

[**]     After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and
collateral estoppel. It may be cited, however, for its persuasive value consistent
with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

("BIA"), denying their applications for asylum, restriction on removal under the Immigration and Nationality Act ("INA"), and relief under the United Nations Convention Against Torture ("CAT"). Petitioners are Christians of the Seventh Day Adventist denomination and Ms. Widjajanti also claims Chinese ethnicity. Petitioners claim they will be persecuted for their religious beliefs and for Ms. Widjajanti's ethnicity if forced to return to Indonesia. The IJ denied their application for asylum as untimely. The IJ found in regard to petitioners' application for restriction on removal under the INA and relief under the CAT that petitioners failed to show past persecution, torture, or that it would be more likely than not that they would be persecuted or tortured upon return to Indonesia. The IJ also found that petitioners would be able to relocate to a safe area of Indonesia if necessary upon their return. The IJ therefore denied restriction on removal and relief under the CAT but granted voluntary departure. The BIA affirmed, and the petition for review was filed. We lack jurisdiction over petitioners' asylum claim and dismiss the petition as to that point. As to petitioners' remaining points, we exercise jurisdiction under 8 U.S.C. § 1252 and deny the petition.

## I. BACKGROUND

Petitioners arrived in the United States in June 1997 and then overstayed their nonimmigrant visas. Petitioners main claim is that they will persecuted if they are forced to return to Indonesia because some of Mr. Sibuea's relatives on

his mother's side, who are Muslim, believe that he and his wife played a role in converting his mother, who was born a Muslim, to Christianity.[1] Mr. Sibuea testified that his mother's family is very militant regarding religion and is politically connected. It is clear from the record that Mr. Sibuea and his wife actually played no role in his mother's conversion in that the conversion occurred in 1960, six years prior to Mr. Sibuea's birth, and he was raised in a Christian household.

Mr. Sibuea met Ms. Widjajanti, who was also raised a Christian, at a private college from which they both graduated with degrees in accounting. They were married in 1996 in Jakarta where they were living and working. Mr. Sibuea claims that his mother managed to keep her conversion to Christianity a secret from her family until June of 1997, four days before Mr. Sibuea, Ms. Widjajanti, and Mr. Sibuea's mother left for the United States.[2] Mr. Sibuea's aunt told his mother that she had been seen entering church and that her family was going to kill the three of them. After the three left for the United States, their house was vandalized.

---

[1] According to hearing testimony, Mr. Sibuea's mother is now a permanent resident in the United States.

[2] Mr. Sibuea and Ms. Widjajanti testified that when they left Indonesia, they were only going to the United States to visit relatives and that their intention was to return to their home country after their visit. Somewhat incongruously, they also testified that prior to their departure Mr. Sibuea's mother was not being as careful about hiding her Christian religion because she knew she was getting ready to leave Indonesia.

Ms. Widjajanti testified that Indonesians of Chinese descent are discriminated against by Muslims in Indonesia. She testified that she had a Chinese name that she only used with her family because she was afraid to use it in public and that the Indonesian government charged Indonesians of Chinese heritage more for government documents than it charged other Indonesians. She testified that there was a major anti-Chinese riot that took place in the 1960's, another that took place in 1997 and 1998, and that she and Mr. Sibuea gave up hope of returning to Indonesia following a bombing that occurred in Bali in 2002. She testified that she was harassed growing up because of her religion and ethnicity and that on two occasions the harassment was so severe that her family reported it to the police. On the first occasion, which occurred when she was nine or ten years old, she was assaulted and insulted by Muslim men who tried to fondle her and then hit her in the back while calling her derogatory names. On the second occasion, which occurred six or seven years after the first, she was driving home from school on a motorcycle and some Muslim men tried to stop her and sexually harass and touch her. She claimed that Muslim neighbors also insulted her family and sometimes threw stones at their house. She claimed that reporting the incidents to the police accomplished nothing.

Mr. Sibuea also testified that he had been harassed and insulted when younger because of his Christianity. He testified that on one occasion, he was physically injured. That time he and a sibling were riding to church on a

-4-

motorcycle when three or four Muslim people stopped them and pushed him in such a way that he fell to the ground and injured his chin. Mr. Sibuea also testified that his family's Muslim neighbors threw trash at their house on occasion. As to his mother's conversion, he testified that his mother's family wanted them killed, but he only identified three particular individuals–two aunts who were in their seventies or eighties and a male cousin in his thirties–when he was asked who specifically might injure them.

Petitioners testified that Mr. Sibuea's mother returned to Indonesia in September 2005 to see a brother who was dying. The brother, allegedly a fanatic Muslim who nevertheless cared deeply for his Christian sister, told her that she should leave Indonesia quickly because their family still wanted to kill her, Mr. Sibuea, and Ms. Widjajanti. Mr. Sibuea's mother immediately went to Jakarta and hid with a friend for three weeks until it was time for her to return to the United States.

As to family members still living in Indonesia, Ms. Widjajanti's father has passed away from natural causes but her mother, brother, and sister, all Chinese Christians, still live in Indonesia. Mr. Sibuea's father also passed away but he has five sisters and three brothers, all Christian. Three of his siblings still live in Indonesia and the other five now live in the United States.[3]

---

[3] It does not appear from the record that any of Mr. Sibuea's relatives living in the United States have received asylum.

## II. DISCUSSION

The BIA issued its decision in a brief order by a single member of the Board adopting and affirming the IJ's decision. *See* 8 C.F.R. § 1003.1(e)(5). We therefore review the BIA's decision as the final order of removal but "may consult the IJ's opinion to the extent that the BIA relied upon or incorporated it." *Sarr v. Gonzales*, 474 F.3d 783, 790 (10th Cir. 2007). On review, we "look to the record for 'substantial evidence' supporting the agency's decision." *Id*. at 788. We review the agency's legal conclusions de novo, *see Tulengkey v. Gonzales*, 425 F.3d 1277, 1280 (10th Cir. 2005), but "[a]gency findings of fact are conclusive unless the record demonstrates that any reasonable adjudicator would be compelled to conclude to the contrary," *Sarr*, 474 F.3d at 788-89 (quotation omitted).

### A. Asylum

Petitioners argue that they are eligible for asylum, that the agency erred in not granting them asylum, and that this court has jurisdiction to review that denial. However, they do not address the untimeliness of their asylum application, which was the agency's stated reason for that denial. Under 8 U.S.C. § 1158(a)(2)(B), an alien may not apply for asylum "unless the alien demonstrates by clear and convincing evidence that the application has been filed within 1 year after the date of the alien's arrival in the United States." There is no dispute that petitioners did not meet this one-year time limit. Nevertheless, the only mention

in their brief of the untimeliness of their application is an acknowledgment that the application was not filed within the one-year limit, followed by the statement that "[Petitioners] are nevertheless members of disfavored group[s] given their Christian and Chinese ethnicity." Aplt. Br. at 15. This is not a coherent argument.

As petitioners' argument addresses the merits of their asylum claim, an issue never reached by the agency, it is moot. To the limited extent that it can be read as attacking the timeliness determination, we are without jurisdiction to conduct such a review. Section 1158(a)(3) specifically instructs that "[n]o court shall have jurisdiction to review any determination of the Attorney General [under the paragraph regarding timeliness]." Point dismissed.

## B. Restriction on Removal

To qualify for restriction on removal, an alien must demonstrate that his "life or freedom would be threatened in [the proposed country of removal] because of the alien's race, religion, nationality, membership in a particular social group, or political opinion."[4] 8 U.S.C. § 1231(b)(3)(A); *see also* 8 C.F.R. § 1208.16(b). "In order to demonstrate eligibility for [restriction on removal], the applicant must establish a clear probability of persecution through

---

[4] Prior to the amendment to the INA made by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, restriction on removal was called withholding of removal. *See Wiransane v. Ashcroft*, 366 F.3d 889, 892 n.1 (10th Cir. 2004). Petitioners' application was filed in 2003, so we use the term restriction on removal.

presentation of evidence establishing that it is more likely than not that the applicant would be subject to persecution." *Woldemeskel v. INS*, 257 F.3d 1185, 1193 (10th Cir. 2001) (quotation omitted). A showing of past persecution creates a rebuttable presumption that the applicant's life or freedom would be threatened in the future in the country of removal on the basis of the original claim. 8 C.F.R. § 1208.16(b)(1).

Mr. Sibuea and Ms. Widjajanti argue that the harassment that they suffered when younger and the threats to their lives from Mr. Sibuea's mother's family constitute past persecution. We agree with the IJ that these incidents do not rise to the level of persecution.

> "Although persecution is not defined in the INA, we have held that a finding of persecution requires the infliction of suffering or harm upon those who differ (in race, religion, or political opinion) in a way regarded as offensive and must entail more than just restrictions or threats to life and liberty." [*Wiransane*, 366 F.3d at 893] (internal quotation omitted). *Compare Tulengkey*, 425 F.3d at 1281 (finding no past persecution where alien was robbed, fondled, and suffered a minor head injury); *Kapcia v. INS*, 944 F.2d 702, 704-05, 708 (10th Cir. 1991) (holding no past persecution where alien had twice been detained for two-day periods during which he was beaten and interrogated, whose parents' home had been searched, whose work locker had been repeatedly broken into, and who had been assigned poor work tasks, denied bonuses, and conscripted into the army, where he was constantly harassed); *and Lie v. Ashcroft*, 396 F.3d 530, 536 (3d Cir. 2005) ("[T]wo isolated criminal acts, perpetrated by unknown assailants, which resulted only in the theft of some personal property and a minor injury, is not sufficiently severe to be considered persecution."); *with Nazaraghaie v. INS*, 102 F.3d 460, 463-64 (10th Cir. 1996) (suggesting that asylum applicant's severe beating and ten month imprisonment on account of his political opinion constituted persecution).

*Sidabutar v. Gonzales*, 503 F.3d 1116, 1124 (10th Cir. 2007).

Nor are Mr. Sibuea and Ms. Widjajanti entitled to restriction on removal based solely on the clear probability of future persecution in Indonesia. We first note that even though they have not suffered past persecution, Mr. Sibuea and Ms. Widjajanti are not required to provide evidence that they would be singled out individually for persecution upon their return if they can establish that "there is a pattern or practice of persecution" of Christians–or Chinese Christians in Ms. Widjajanti's case–in Indonesia. *See* 8 C.F.R. § 1208.16(b)(2)(i-ii). A pattern or practice of persecution entails "something on the order of organized or systematic or pervasive persecution." *Woldemeskel*, 257 F.3d at 1191 (quotation omitted). The allegations in the record do not support such a conclusion in this case.

As to the claim that Mr. Sibuea and Ms. Widjajanti would be singled out individually by Mr. Sibuea's mother's family for converting Mr. Sibuea's mother to Christianity, we believe the IJ's factual finding that this would be unlikely to occur is supported by substantial evidence. The record contains a baptism certificate clearly showing that the conversion took place six years before Mr. Sibuea was even born and, if that is the only reason that Mr. Sibuea's family would have to perpetrate violence against petitioners, the misunderstanding would seem to be easily dispelled.

More importantly, the IJ found that petitioners could relocate to safety within Indonesia.

> [A]n applicant cannot demonstrate that his or her life or freedom would be threatened if the . . . [IJ] finds that the applicant could avoid a future threat to his or her life or freedom by relocating to another part of the proposed country of removal and, under all the circumstances, it would be reasonable to expect the applicant to do so.

8 C.F.R. § 1208.16(b)(2). Since they did not establish past persecution, Mr. Sibuea and Ms. Widjajanti bore the burden of proving that it would not be reasonable for them to relocate. *See id*. § 1208.16(b)(3)(i). We agree with the BIA's determination that relocation would remove the threat from Ms. Widjajanti's family and that the record did not demonstrate that relocation would be unreasonable in a country of 241 million people. The IJ held that "[a]s Christians, they would be facing persecution in Indonesia only in an isolated or non-countrywide situation and not as the result of government action." Admin. R. at 68. This is consistent with the State Department country reports on Indonesia that are in the record. *See id*. at 234, 245-47, 260-70. It is true that petitioners testified that Mr. Sibuea's mother's family was well-connected and could find them if they returned, and that these connections would also allow them to effect retribution without legal consequences, but this testimony was very general–simply that Mr. Sibuea knew the family was very wealthy, included important Muslim leaders, and had many friends and acquaintances who worked

-10-

in the government and with police. Nevertheless, Mr. Sibuea failed to specifically identify any of these friends and acquaintances, could only identify one member of his mother's family who worked for the government, and could not identify what kind of work that person did. It is therefore entirely unclear what level of influence Mr. Sibuea's mother's family had with the government and whether that influence was of a local or national variety. Further, there is no evidence that petitioners ever went to the police or government regarding the threats to Mr. Subuea's wife's family. Consequently, we cannot say that substantial evidence is lacking as to the agency's determination. Point denied.

## C. Relief under the CAT

Although petitioners assert in two headings in their brief that this court has jurisdiction to review the denial of relief under the CAT, there is no argument in the brief that they have been tortured, would face torture if returned to Indonesia, or are otherwise entitled to relief under the CAT. Accordingly, we deem the argument waived. *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1202 n.4 (10th Cir. 2003). Point denied.

## III. CONCLUSION

The petition for review is DISMISSED for lack of jurisdiction to the extent

-11-

it seeks review of the denial of asylum on the ground that the application was untimely.  The remainder of the petition for review is DENIED.

Entered for the Court

John C. Porfilio
Circuit Judge