**F I L E D**

PUBLISH

**May 12, 2006**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

DJIBY DIALLO
a.k.a. ABDOUL DIALLO,

      Petitioner,

v.

No. 05-9558

ALBERTO R. GONZALES,
United States Attorney General,

      Respondent.

---

**APPEAL FROM THE EXECUTIVE OFFICE
OF IMMIGRATION REVIEW
BOARD OF IMMIGRATION APPEALS
(AGENCY NO. A73-639-431)**

---

Submitted on the briefs:[*]

Sharon A. Healey, University of Denver International Human Rights Advocacy
Center Asylum Project, Denver, Colorado, for Petitioner.

Peter D. Keisler, Assistant Attorney General, Mark C. Walters, Assistant Director,
Melissa Neiman-Kelting, Office of Immigration Litigation, Civil Division,
Washington, D.C., for Respondent.

---

[*]    After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument.

Before **TYMKOVICH**, **McKAY**, and **BALDOCK**, Circuit Judges.

**McKAY**, Circuit Judge.

Petitioner, Djiby Diallo (a.k.a. Abdoul Diallo), is a native and citizen of Mauritania, a country in northwest Africa. Diallo is a black Fulani, which is a subset of the largest non-Moor ethnic group in Mauritania, the Halpulaar. The government of Mauritania is dominated by white Moors of Arab/Berber descent. Between 1989 and 1990, ethnic conflict in the country culminated in the government's expulsion of approximately 75,000 blacks. Most of those expelled were forced into neighboring Senegal. International human rights organizations charge that the government sought, through the mass expulsion, to rid Mauritania of its black population and to confiscate the vacant property left behind.

Diallo claims that he was a victim of that mass expulsion. Based on his story of persecution, the Board of Immigration Appeals ("BIA") granted Diallo asylum in the United States in 1997. However, his asylum status was terminated in 2004 by an immigration judge ("IJ") who concluded that Diallo had omitted material information on his asylum application. The IJ also denied a renewed asylum application that Diallo submitted, disclosing the previously omitted

information.  Diallo appealed the IJ's decision unsuccessfully to the BIA and now seeks review of the BIA's decision.  We deny the petition for review.

## I.  Background

As culled from his most recent asylum application and supporting testimony, Diallo's story of persecution and escape is as follows.  He was born in 1964 in a Mauritanian village in the Senegal River Valley.  He was still living there with his family when one day in 1989 he returned to the village from tending to his livestock to discover three military trucks outside his house.  Soldiers arrested him along with others in his village, confiscated his national identification card, and took him to a military prison camp.  Although, the soldiers were black, they were not Fulani.  Diallo believes that the soldiers were black Moors working for the Mauritanian government.  In the prison camp, he was forced to do hard labor every day and was subjected to frequent beatings.  During one beating, he lost two teeth after a soldier struck him with the back of his fist.

After being in the prison camp for approximately one month, he was rounded up with other prisoners and taken by truck to the Senegal River.  Soldiers ordered him to cross the river into Senegal and never return, which he did.  On the Senegal side of the river he was greeted by red cross workers who took him to a refugee camp in Thilogne.  At the camp he found his father, siblings, and his

father's second wife but not his own mother.  When he asked his father what happened to his mother, his father refused to talk about it.  He never saw his mother again and assumed that she had been killed.  After living in the camp for two years, he made his way to the coastal city of Dakar and from there to the United States as a stowaway on a ship.

He arrived in Miami sometime in 1992 and immediately went to New York City where he located a Fulani community.  In New York, he purchased a counterfeit employment authorization document ("EAD"), which bore his picture but not his true name.  The name on the EAD was Abdoul Diallo, a man he claims he has never met.  In 1995, Diallo moved to Colorado where he used the EAD to work and obtain a drivers license and social security card.

In 1996, he applied for asylum using his true name, Djiby Diallo.  He did not disclose on the application that he had an EAD under the name Abdoul Diallo.  The IJ denied his application because he did not believe Diallo's story of persecution.  However, Diallo successfully appealed the IJ's decision to the BIA and was granted asylum on September 26, 1997.  Thereafter, he obtained work authorization in his own name and ceased using the alias.  He also obtained refugee travel documents under his own name, which he used to travel to Senegal and Italy.  His last entry into the United States was in 2002.

## II.  The Agency Proceedings

On May 28, 2004, the government issued a Notice to Appear charging Diallo with being removable under section 237(a)(1)(A) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1227(a)(1)(A). The government alleged that Diallo procured his asylum status through fraud because he did not disclose his use of an alias on his asylum application. Diallo was also charged with filing an unsuccessful asylum application in 1994 under the name Abdoul Diallo. In the removal proceedings, Diallo admitted to using the false EAD but denied that he had ever applied for asylum under the name Abdoul Diallo. On August 30, 2004, he submitted what he titled an Amended Asylum Application, disclosing that he had used the name Abdoul Diallo. At the same time, he applied for restriction on removal and adjustment of status.

The IJ conducted a multi-session hearing from October to December 2004 and took evidence concerning both the removal charges and Diallo's renewed requests for asylum, restriction on removal, and adjustment of status. He issued a written decision on December 30, 2004, sustaining the government's removal charges, terminating Diallo's prior grant of asylum, and denying the pending applications.[1] In his decision, the IJ sua sponte raised the issue of changed country conditions. He held that conditions in Mauritania had improved since

---

[1] The instant petition does not seek review of the IJ's denial of Diallo's requests for restriction on removal and adjustment of status.

Diallo's arrest in 1989, and that Diallo therefore no longer had a well-founded fear of persecution. Based in part on this finding, the IJ terminated Diallo's prior grant of asylum. He also held that termination was proper based on Diallo's fraudulent withholding of his alias on his 1996 asylum application. As to the 2004 application, the IJ again found that Diallo was ineligible for asylum due to changed country conditions, but he also determined that the application was untimely because it was not filed within one year of Diallo's last entry into the United States. Finally, the IJ found Diallo's testimony not credible due to inconsistencies in his story. He cited the adverse credibility finding as an additional reason to deny Diallo's asylum application.

On June 9, 2005, the BIA issued a three-page opinion affirming the IJ's decision and adopting most, but not all, of the IJ's reasoning. The BIA held that Diallo's failure to disclose his use of an alias on his 1996 asylum application warranted termination of his asylum status. The BIA also held that Diallo's August 30, 2004, asylum application was not an amendment, but an untimely new filing barred by statute. Finally, the BIA deferred to the IJ's credibility findings and concluded that Diallo had failed to establish eligibility for asylum. The BIA did not address the IJ's reasoning with respect to changed country conditions.

Diallo challenges both the termination of his prior grant of asylum and the denial of his 2004 application. He argues that there was insufficient evidence to

support the IJ's finding that his asylum status was procured by fraud. He also argues that the IJ violated his due process rights by sua sponte considering changed country conditions as a basis for termination, and he challenges the IJ's specific finding that he is no longer a refugee due to improved conditions in Mauritania. With respect to his new application, Diallo argues that the IJ's timeliness determination was error and that his adverse credibility findings were not supported by the evidence.

### III. Discussion

*A. Principles of Judicial Review*

Because this petition follows reasoned opinions from both the IJ and BIA, we will first delineate the scope of our judicial review. As we recently reiterated, "[w]e have general jurisdiction to review only a final order of removal, 8 U.S.C. § 1252(a)(1), and there is no final order until the BIA acts." *Uanreroro v. Gonzales*, 443 F.3d 1197, 1203 (10th Cir. 2006) (quotations omitted). We held in *Uanreroro* that when the BIA affirms an IJ decision with a brief order pursuant to 8 C.F.R. § 1003.1(e)(5), "in deference to the agency's own procedures, we will not affirm on grounds raised in the IJ decision unless they are relied upon by the BIA in its affirmance." *Uanreroro*, 443 F.3d at 1204. We clarified that resort to the IJ's decision is appropriate in situations where the BIA incorporates the IJ's rationale or a summary of its reasoning. *Id.* However, we were careful to note

-7-

that "[a]s long as the BIA decision contains a discernible substantive

discussion . . . our review extends no further, unless it explicitly incorporates or

references an expanded version of the same reasoning below." *Id.*

The BIA decision in this case clearly was issued pursuant to § 1003.1(e)(5),

as it does not contain the requisite language for an affirmance without opinion,

*see* § 1003.1(e)(4)(ii), and was drafted by a single Board member as opposed to a

three-member panel as contemplated in § 1003.1(e)(6). *See Uanreroro*, 443 F.3d

at 1204; *Cruz-Funez v. Gonzales*, 406 F.3d 1187, 1190 (10th Cir. 2005).

Therefore, we review the BIA's decision as the final agency determination and

limit our review to issues specifically addressed therein.[2]  We will resort to the

IJ's reasoning as necessary pursuant to the guidelines set forth in *Uanreroro*.

In reviewing a decision of the BIA,

[w]e consider any legal questions de novo, and we review the
agency's findings of fact under the substantial evidence standard.
Under that test, our duty is to guarantee that factual determinations
are supported by reasonable, substantial and probative evidence
considering the record as a whole.

*Elzour v. Ashcroft*, 378 F.3d 1143, 1150 (10th Cir. 2004).

B.  *Termination of Asylum*

---

[2]     The government argues that Diallo's petition should be dismissed because
it challenges the IJ's rather than the BIA's decision.  We decline to dismiss the
petition on those grounds, as we have jurisdiction to review his petition
nothwithstanding that his arguments are nominally directed at the IJ's decision
rather than the BIA's.  *Schroeck v. Gonzales*, 429 F.3d 947, 951 (10th Cir. 2005).

-8-

*i. Evidence of Fraud*

"An alien who has been granted asylum may not be deported or removed unless his or her asylum status is terminated." *Id.* at 1148 (quotation omitted). The BIA affirmed the IJ's termination of Diallo's asylum in this case because it concluded that Diallo had "obtained his asylee status through fraud and willful misrepresentation." Admin. R. at 3; *see* 8 C.F.R. § 1208.24(a)(1) and (f). Because Diallo signed the application, the BIA held that he could properly be held accountable for the truth of its contents and the supporting evidence. It found that Diallo committed fraud by failing to disclose that he had applied for asylum under the name Abdoul Diallo and used a false EAD under that name. Diallo argues that the record contains insufficient evidence to support a finding that he ever requested asylum under the name Abdoul Diallo. He also claims that because he did not personally fill out his asylum application, he cannot be held to have willfully committed fraud.

Based on our review of the record, we conclude that there is insubstantial evidence to support the BIA's finding that Diallo previously filed for asylum under the name Abdoul Diallo. While the record does contain a report of a fingerprint analysis concluding that Djiby Diallo and Abdoul Diallo are the same person, the exhibits to the report are not attached. At his asylum hearing, Diallo testified that he could not recall having his fingerprints taken and that he never

signed Abdoul Diallo's name to a fingerprint card. His testimony coupled with the lack of evidentiary support in the record for the examining official's conclusion calls into question the reliability of the underlying documentation. Without the fingerprint analysis, the record evidence simply does not support a finding that Djiby and Abdoul Diallo are one and the same.

There is, however, substantial evidence to support the BIA's finding that Diallo committed fraud on his 1996 asylum application. Question 16 plainly asked for other names used by the applicant, and Diallo left that question blank even though he was using an EAD under the name Abdoul Diallo. Asylum seekers must be held accountable for the veracity of statements that they swear to under oath. Accordingly, we affirm the BIA's termination of Diallo's asylum status pursuant to 8 C.F.R. § 1208.24(f), which permits the BIA to terminate a previous grant of asylum in cases of fraud.

*ii. Changed Country Conditions*

The IJ also cited changed country conditions as an additional reason to terminate Diallo's asylum. He held that due to improved conditions in Mauritania, Diallo no longer had a well-founded fear of persecution and thus did not qualify as a refugee. Diallo argues that the State Department reports on which the IJ relied present an inaccurate picture of current conditions in Mauritania. We will not reach this issue. In its affirmance, the BIA did not rely on or even

reference that portion of the IJ's decision concerning changed country conditions. Rather, the BIA's conclusion that termination was proper was based entirely on its finding that Diallo had committed fraud. We assume that the BIA intended to rely on "only the reasons expressly stated in its decision." *Uanreroro*, 443 F.3d 1205. Accordingly, in deference to the agency's own procedures, we will not review the IJ's specific findings with respect to changed country conditions. *See id.* at 1204.

### iii. Due Process

The Fifth Amendment entitles aliens to due process of law in removal proceedings. *Reno v. Flores*, 507 U.S. 292, 306 (1993). In addition to his substantive challenge, Diallo makes a procedural challenge to the IJ's consideration of changed country conditions. He claims that the IJ violated his due process rights by relying on changed country conditions as an alternate ground to terminate his asylum even though that charge was not listed in the Notice to Appear. The BIA rejected this argument because it held that the IJ had acted pursuant to a specific grant of regulatory authority.[3]

---

[3] The regulation at issue allows an IJ to terminate a grant of asylum if it is shown that the alien "no longer has a well-founded fear of persecution upon

(continued...)

We likewise conclude that Diallo's due process claim lacks merit, but not for the simple reason that the IJ acted pursuant to regulatory authority. It is well established that a regulation itself can violate due process. *Brennan v. Occupational Safety & Health Review Comm'n*, 505 F.2d 869, 872 (10th Cir. 1974). Instead, we conclude that Diallo cannot make the required showing that he "was prejudiced by the actions he claims violated his Fifth Amendment rights." *Berrum-Garcia v. Comfort*, 390 F.3d 1158, 1165 (10th Cir. 2004). Diallo was given ample opportunity to contest that he was removable based on changed country conditions. His filings at all stages of the removal proceedings contained numerous reports detailing what he claims are continuing human rights abuses in Mauritania. The IJ's rejection of his argument based on information contained in State Department reports was not tantamount to a due process violation. We therefore affirm the BIA's holding regarding the due process claim.

## C. Denial of Asylum Application

On August 30, 2004, three months into the removal proceedings, Diallo filed what he called an Amended Asylum Application disclosing the fact that he had used the alias Abdoul Diallo. The IJ denied the application, holding that it was untimely because it was not filed within one year of Diallo's last entry into

[3](...continued)
return due to a change of country conditions." 8 C.F.R. §§ 1208.24(a)(3) and (f).

the United States. The IJ also found Diallo's testimony not credible because of inconsistencies in his story. The BIA upheld the IJ's timeliness determination and deferred to the IJ's credibility findings.

*i. Timeliness*

Diallo claims that his application was not time-barred under the statute because it was an amendment to his timely application filed in 1996 and he argues that we have jurisdiction to determine whether his application was a new filing or an amendment. The government argues that 8 U.S.C. § 1158(a)(3) deprives this court of jurisdiction to review the BIA's timeliness determination.

"We have jurisdiction to determine our jurisdiction." *Schroeck v. Gonzales*, 429 F.3d 947, 950 (10th Cir. 2005). Title 8 of the United States Code, § 1158(a)(2)(B) provides that an alien may apply for asylum provided that he "demonstrates by clear and convincing evidence that the application has been filed within 1 year after the date of the alien's arrival in the United States." The statute further provides that "[n]o court shall have jurisdiction to review any determination of the Attorney General under [§ 1158(a)(2)]." 8 U.S.C. § 1158(a)(3). We have interpreted § 1158(a)(3) literally to mean that federal courts "lack jurisdiction to review a determination related to the timeliness of an asylum application." *Tsevegmid v. Ashcroft*, 336 F.3d 1231, 1235 (10th Cir. 2003). However, the statutory landscape has changed since we decided

-13-

*Tsevegmid*. On May 11, 2005, the President signed into law the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231 ("REAL ID Act"), which expressly grants us jurisdiction to review "constitutional claims or questions of law" raised in a petition for review. REAL ID Act § 106(a)(1)(A)(iii) ("Section 106") (codified at 8 U.S.C. § 1252(a)(2)(D)). Thus, the jurisdictional bar of § 1158(a)(3) has been abrogated by the REAL ID Act to the extent a petitioner's challenge to a timeliness determination raises a constitutional claim or question of law. However, challenges directed solely at the agency's discretionary and factual determinations remain outside the scope of judicial review. *See Chen v. U.S. Dep't of Justice*, 434 F.3d 144, 154 (2d Cir. 2006).

Diallo's appeal of the BIA's timeliness determination raises no constitutional claims, which leaves the question of whether his challenge raises a question of law reviewable pursuant to Section 106. The REAL ID Act does not define the phrase "questions of law." Therefore, we must ask whether, in using that language, Congress intended to include all claims having a legal dimension or only certain legal claims, a question not yet widely addressed by the courts. The Eleventh Circuit seems to have adopted a per se rule that a BIA's timeliness determination, as a matter of law, does not raise any constitutional claims or questions of law. *See Chacon-Botero v. U.S. Att'y Gen.*, 427 F.3d 954, 957 (11th Cir. 2005) (holding that "the timeliness of an asylum application is not a

-14-

constitutional claim or question of law covered by the Real ID Act's changes"). Whereas, the Second and Ninth Circuits have held, based on legislative history, that "questions of law" as used in Section 106 refers to issues of statutory construction. *Ramadan v. Gonzales*, 427 F.3d 1218, 1222 (9th Cir. 2005); *Chen*, 434 F.3d at 153.

The House Conference Committee Report on the REAL ID Act is the most authoritative source on the meaning of the phrase "questions of law" in Section 106. *See United States v. Simmonds*, 111 F.3d 737, 742 (10th Cir. 1997) (holding that resort to legislative history is appropriate when the statutory language is ambiguous), overruled on other grounds by *United States v. Hurst*, 322 F.3d 1256 (10th Cir. 2003). It tells us that "questions of law" refers to "those issues that were historically reviewable on habeas-constitutional and statutory-construction questions, not discretionary or factual questions." H.R. Rep. No. 109-72 at 175 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 240. Accordingly, we agree with the Second and Ninth Circuits that in addition to constitutional claims, the REAL ID Act grants us jurisdiction to review "a narrow category of issues regarding statutory construction." *Chen*, 434 F.3d at 153 (*quoting Ramadan*, 427 F.3d at 1222).

In this case, the BIA concluded that Diallo's 2004 asylum application was untimely because it was not filed within a year of his last entry into the United

States.  However, when Diallo last entered the United States in 2002, he did so as a returning asylee.  It was not until he received the Notice to Appear, dated May 28, 2004, that he was even aware that his asylum status was being questioned.  Of course, his asylum status was not actually terminated until December 30, 2004, when the IJ issued his decision.  Under these circumstances, Diallo had no obligation to refile for asylum when he reentered the country in 2002.  We conclude that the BIA's contrary holding was based on an erroneous interpretation of 8 U.S.C. § 1158(a)(2)(B), which we have jurisdiction to review under Section 106 of the REAL ID Act.

The BIA's interpretation of the one-year requirement would have asylees filing duplicate applications every time they reenter the country based on the possibility that their case could be reopened and their asylum status terminated.  We need not resort to legislative history to determine that this was not what Congress intended.  Instead we hold that the one-year requirement of § 1158(a)(2)(B), as applicable to aliens whose asylum status has been terminated, begins to run from the date of termination.  In Diallo's case, the one-year period expired on December 30, 2005.  Since he filed his asylum application before that date, we hold that it was timely and reverse the BIA's timeliness determination.  Having reached this conclusion, we need not reach the issue of whether Diallo's

2004 asylum application should have been considered an amendment to his 1996 application.

*ii. Credibility*

In addition to finding his application untimely, the BIA held that Diallo failed to present credible testimony to establish eligibility for asylum.[4] The BIA based its conclusion on several inconsistencies between Diallo's testimony at his 1996 asylum hearing and his 2004 hearing. Particularly troubling was Diallo's testimony regarding which family members he reunited with upon his arrival at the refugee camp in Senegal. At his 1996 hearing, he testified that he found his parents, but at his most recent hearing, he testified that he found only his father and assumed his mother had been killed. The BIA also noted that in 1996, Diallo testified that he lost a tooth in the prison camp after being struck with the butt of a rifle, but in 2004, he testified that he lost two teeth after being hit with a fist. Finally, the BIA found the details of Diallo's arrest contradictory. In 1996, he testified that he was arrested when he arrived home after tending to his livestock, but in 2004, he testified that the soldiers did not find him in the village because he was still in the bush with the livestock. The BIA concluded that Diallo had

---

[4] An asylum application is a two-step process. First, the applicant must show that he is eligible for asylum by establishing that he is a refugee as defined in 8 U.S.C. § 1101(a)(42). *Yuk v. Ashcroft*, 355 F.3d 1222, 1232 (10th Cir. 2004). Then, having established his eligibility, he must convince the Attorney General to exercise his discretion and grant asylum. *Id.* at 1233.

failed to provide a reasonable explanation for the discrepancies and therefore deferred to the IJ's adverse credibility findings. Diallo argues that the inconsistencies in his story were not material to his asylum claim and therefore could not have formed the basis of an adverse credibility finding.

"[C]redibility determinations, like other findings of fact, are subject to the substantial evidence test. In particular, we have held that in order to determine that an alien is not a credible witness, the IJ must give specific, cogent reasons for disbelieving his or her testimony." *Elzour*, 378 F.3d at 1150 (citations and quotations omitted). "We may not weigh the evidence, and we will not question the immigration judge's or BIA's credibility determinations as long as they are substantially reasonable." *Woldemeskel v. INS*, 257 F.3d 1185, 1192 (10th Cir. 2001). We have stated that "[a] proper incredibility determination can be based on inherent inconsistencies in the applicant's testimony." *Chaib v. Ashcroft*, 397 F.3d 1273, 1278 (10th Cir. 2005).

Having reviewed the record in accordance with the prescribed deferential standard of review, we cannot conclude that the IJ's and BIA's credibility findings were substantially unreasonable. Although some of the inconsistencies in Diallo's story can be attributed to translation problems, it is clear from the transcript of his hearing that he was given the opportunity to explain the inconsistencies but failed to do so to the IJ's satisfaction. The stories that Diallo

related at his two asylum hearings, which occurred eight years apart, certainly were more similar than different. Still, we cannot say that the IJ's conclusion that Diallo failed to establish refugee status was "contrary to what a reasonable factfinder would have been compelled to conclude." *Batalova v. Ashcroft*, 355 F.3d 1246, 1255 (10th Cir. 2004) (quotation omitted). Nor can we say that the inconsistencies were immaterial to his asylum application. Therefore, even though we conclude that his application was timely, we nonetheless hold that Diallo has "failed to carry the heavy burden placed on those challenging adverse asylum determinations." *Id.* (quotation omitted).

## IV. Conclusion

For the foregoing reasons, we affirm the BIA's termination of Diallo's prior grant of asylum. We reverse the BIA's determination that Diallo's 2004 asylum application was untimely, but affirm its final decision to deny asylum based on Diallo's failure to establish that he is a refugee. The petition for review is DENIED.