**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 8, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

ISSA TANDIA,

      Petitioner,

v.

ALBERTO R. GONZALES,
United States Attorney General,

      Respondent.

No. 06-9565
(No. A97-201-584)
(Petition for Review)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE**, **SEYMOUR**, and **ANDERSON**, Circuit Judges.

Petitioner Issa Tandia, a native and citizen of Mauritania, seeks review of

the Board of Immigration Appeal's (BIA's) decision affirming an Immigration

Judge's (IJ's) order that denied his application for asylum.[1]  Specifically, he

---

[*]    After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument.  *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore
ordered submitted without oral argument.  This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and
collateral estoppel.  It may be cited, however, for its persuasive value consistent
with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1]    The IJ also denied Mr. Tandia's applications for restriction on removal and
relief under the Convention Against Torture (CAT), but Mr. Tandia did not
pursue those avenues on appeal to the BIA; nor has he raised them in the instant
petition.  Consequently, they are waived.  *See Tulengkey v. Gonzales*, 425 F.3d

(continued...)

challenges the BIA's determinations that his testimony was not credible and that his fear of being persecuted in Mauritania was negated by changed country conditions. We conclude that the BIA's credibility determination was properly supported, and thus we deny the petition without reaching the issue of changed country conditions.

## BACKGROUND

Tandia was born in Kaedi, a south-central Mauritanian town near the Senegalese border. He is a Soninké black African. During the 1989-91 period, ethnic conflict within Mauritania culminated with the government of President Maaouiya Ould Sid'Ahmed Taya expelling tens of thousands of black Africans.[2] Following the January 1992 presidential election, President Taya's government arrested supporters of the opposition political party.[3]

Tandia's father was an opposition-party organizer, who was arrested in January 1992 after the election, along with Tandia's mother and siblings. Two weeks later, Tandia, who was then twelve, was purportedly arrested in Kaedi and

---

[1](...continued)
1277, 1279 n.1 (10th Cir. 2005).

[2]     *See* Human Rights Watch/Africa, *Mauritania's Campaign of Terror* at 2-3, 5 (1994), Admin. R. at 268-69; *see also* U.S. Dep't of State, *1999 Country Reports on Human Rights Practices* at 2 (2000), http://www.state.gov/www/global/human_rights/1999_hrp_report/mauritan.html, Admin. R. at 416.

[3]     *See* Human Rights Watch, *Human Rights Developments: Mauritania*, http://www.hrw.org/reports/1993/WR93/Afw-05.htm, Admin. R. at 220-21.

taken to a Mauritanian military camp, where he was "repeatedly interrogated about his father's political activities," and "kicked and beaten with a police baton every two to three days." Pet'r Br. at 5. Tandia claims that after about three weeks, he was transported to the Senegalese River and forced to cross into Senegal. He spent the next ten years in a small Senegalese refugee camp. In October 2002, at the age of twenty-two, he entered the United States using a friend's passport.

After several months in this country, Tandia applied for asylum, stating on his application that he left Mauritania on "09-10-91," Admin. R. at 507, that his father was killed while in police custody "because of his membership [in the opposition political party during the] 1991-92 election," *id.* at 511, and that he believed he would be harmed by the government of President Taya if returned to Mauritania, *id.* Tandia was interviewed by an Asylum Officer, who found him ineligible for asylum and referred him to an IJ.

At the immigration hearing, Tandia provided conflicting testimony. He first claimed that he was arrested about two weeks after his father, who was arrested "right after" the January 1992 elections, *id.* at 89, and that he (Tandia) was held for about three weeks before being expelled into Senegal, *id.* at 90, 94. But upon further inquiry by the IJ, Tandia testified that his asylum application correctly recited that he left Mauritania on September 10, 1991. *Id.* at 127. Given that he could not have been arrested in Kaedi in 1992 if he had been

expelled from Mauritania in 1991, the IJ made further inquiry. Tandia claimed that the person who assisted him with the asylum application "made mistakes," but then he again testified that he was arrested two weeks after his father in January 1992 and that he "left Mauritania [in] September 1991," *id*. at 131. And when asked once more about the discrepancy, Tandia changed his testimony, stating that he left Mauritania in September 1992. *Id*. at 132. But he continued to testify that he was arrested "[t]wo, three weeks" after his father, "right after" the January 1992 elections. *Id*. at 134. The Asylum Officer also appeared at the hearing, testifying that Tandia told him that he was arrested on September 10, 1991, that he was deported to Senegal the same day, and that he later learned that his father was arrested in 1992 and had died in prison. *Id*. at 151, 153-54; *see also id*. at 233 (Asylum Officer's written report).

Tandia's credibility was further undermined by his testimony that (1) the population of Kaedi was around 800 (presumably at the time of his expulsion), *id*. at 116, when it is presently "a city of over 60,000 people and is the largest city and administrative center of the Gorgol region of Southern Mauritania,"[4] (2) he could not recall the name of the refugee camp, Admin. R. at 137; and (3) he learned the Bambara language, in which he testified in part, from his father's

---

[4]     Wikipedia, *Kaédi*, at http://en.wikipedia.org/wiki/Ka%C3%A9di (last visited May 21, 2007).

friends who lived in Nouakchott, the Mauritanian capital, even though Bambara is not widely spoken there, *id.* at 125.

The IJ denied Tandia relief, finding that he was not credible, that his fear of persecution was undermined by changed conditions in Mauritania, and that he had resettled in Senegal. Accordingly, the IJ ordered him removed to either Mauritania or Senegal. The BIA affirmed in a one-member order, agreeing with the IJ that Tandia was not credible, but citing only Tandia's conflicting dates and inability to recall the name of the refugee camp. The BIA also agreed with the IJ about conditions in Mauritania, relying on the State Department's 2003 Country Report on Mauritania as showing that "most of the people who were expelled or fled during the worst period of abuse have returned to Mauritania with the consent of the government," which is cooperating in efforts to assist returning refugees and returning confiscated property. *Id.* at 3. The BIA did not address resettlement.

Tandia now petitions this court for review.

## DISCUSSION

### I. Standards of Review

Because a single member of the BIA decided Tandia's appeal and issued a brief opinion, "we review the BIA's decision as the final agency determination and limit our review to issues specifically addressed therein." *Diallo v. Gonzales*, 447 F.3d 1274, 1279 (10th Cir. 2006). We review the BIA's factual findings for

substantial evidence, reversing only if "the record demonstrates that any reasonable adjudicator would be compelled to conclude to the contrary." *Sarr v. Gonzales*, 474 F.3d 783, 788-89 (10th Cir. 2007) (quotation omitted). The BIA's legal conclusions, however, are reviewed de novo. *Diallo*, 447 F.3d at 1279.

## II. Refugee Status

To be eligible for asylum, an alien must qualify as a refugee by showing that he or she has "suffered past persecution or has a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Tulengkey v. Gonzales*, 425 F.3d 1277, 1280 (10th Cir. 2005) (footnote, quotations, and alteration omitted). "Aliens basing their asylum claims upon a well-founded fear of future persecution must show both a genuine, subjective fear of persecution, and an objective basis by credible, direct, and specific evidence in the record, of facts that would support a reasonable fear of persecution." *Yan v. Gonzales*, 438 F.3d 1249, 1251 (10th Cir. 2006) (quotation omitted).

## III. Credibility

"[A]n asylum applicant's otherwise credible testimony constitutes sufficient evidence to support an application." *Solomon v. Gonzales*, 454 F.3d 1160, 1165 (10th Cir. 2006). "[W]e will affirm a denial of asylum based on an adverse credibility finding only if the IJ or the BIA has presented specific, cogent reasons for the finding." *Id.* at 1164 (quotation omitted). A proper incredibility

determination may "be based upon such factors as inconsistencies in the witness' testimony, lack of sufficient detail or implausibility." *Elzour v. Ashcroft*, 378 F.3d 1143, 1152 (10th Cir. 2004).

Tandia first assigns error to the BIA's failure to explicitly address his explanations for providing inconsistent expulsion dates. He claims that the inconsistencies resulted from (1) mistakes in translation by individuals helping with his asylum application and interview; and (2) his difficulty remembering events that occurred a decade earlier, when he was only twelve. In discussing Tandia's credibility, the BIA cited the pages of the IJ's decision that analyzed the credibility issue, including Tandia's explanations. Because a one-member brief affirmance by the BIA "is, by definition, a truncated process which can rest on what has been said below, we may consult the IJ's opinion to the extent that the BIA relied upon or incorporated it." *Sarr*, 474 F.3d at 790.

The IJ discounted Tandia's explanations, finding it unlikely that two different translators made the same mistake in identifying September 10, 1991, as Tandia's expulsion date, and that "[i]t was up to [Tandia] to provide accurate information." Admin. R. at 59-60. We agree, and conclude that Tandia's explanations do not account for his continued insistence on the 1991 date up until the middle of the merits hearing—where he was assisted by a third translator and also testified in English. Further, Tandia has not attempted to explain how his mid-hearing change of the expulsion date to September 1992 would make sense

with his other testimony, which was that he was arrested two weeks after his father, "right after" the January 1992 elections, *id.* at 89, and that he was held for only three weeks before being expelled into Senegal.

Tandia also argues, without elaboration, that "the inconsistencies did not go to the heart of his application." Pet'r Br. at 13.[5] While a "minor discrepancy" that makes "no difference to the strength or plausibility of [the alien's] story" will not support "an adverse credibility finding," *Sarr*, 474 F.3d at 796, Tandia's inconsistent expulsion dates cast doubt on the basic premise of his story. Specifically, if he was arrested and expelled from Mauritania on September 10, 1991, as he claimed until the middle of the merits hearing, then he could not have been arrested in Kaedi after the January 1992 election and beaten and interrogated for three weeks about his father's political activities. And if he was expelled in September 1992, he would had to have been detained much longer than three weeks.

Tandia additionally claims that the BIA misconstrued his testimony when it found it "implausible that [he] lived in a refugee camp in Dakar, Senegal for 10 years, but was unable to recall the name of the camp." Admin. R. at 2-3. Tandia testified, "I don't know the name [of] the refugee camp," *id.* at 137, "I don't

---

[5]      Under the Real ID Act of 2005, a credibility determination may be made "without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim." 8 U.S.C. § 1158(b)(1)(B)(iii). This provision of the Act, however, does not affect Tandia, as he sought asylum before the Act's effective date, May 11, 2005. *See Yan*, 438 F.3d at 1251-52 n.3.

know exactly the name [of] the camp," *id.* at 138, and "(Through interpreter) I can't remember the whole thing, but I remember it was refugee camp of Dakar. (In English) And some other word - - I don't remember all this one," *id.* at 143. While it may have been more accurate for the BIA to say that Tandia was unable to recall the camp's complete name, it was not "substantially unreasonable," *Diallo*, 447 F.3d at 1283, for the BIA to consider Tandia's memory lapse, in conjunction with his date discrepancies, to find him not credible.

We uphold the BIA's credibility determination, which was specific and cogent.

Because an adverse credibility finding necessarily precludes a determination that the alien has demonstrated past persecution or subjectively fears future persecution, *Ramsameachire v. Ashcroft*, 357 F.3d 169, 179, 185 (2nd Cir. 2004), *see also Diallo*, 447 F.3d at 1283 (affirming BIA's decision to deny asylum on the basis of incredibility alone), we need not reach the BIA's alternate finding that improved conditions in Mauritania would negate Tandia's fear of persecution.[6]

---

[6] While it may be appropriate to consider country conditions in the context of a CAT claim even when the alien is found not credible, *see Tarrawally v. Ashcroft*, 338 F.3d 180, 188 (3d Cir. 2003) (holding that "a decision-maker must review claims for relief under the [CAT] and consider relevant country conditions even where adverse credibility determinations have precluded relief under the INA"), Tandia did not pursue his CAT claim on appeal to the BIA or in his petition to this court. Consequently, we do not consider it. *See supra* note 1.

The petition for review is DENIED, and we VACATE the stay imposed by this court on July 17, 2006.

Entered for the Court


Mary Beck Briscoe
Circuit Judge