FILED
United States Court of Appeals
Tenth Circuit

May 16, 2014

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

ADAM SSENSAMBA DDUNGU,
a/k/a Sensamba Adam Ddunga,

Petitioner,

v.

ERIC H. HOLDER, JR.,
United States Attorney General,

Respondent.

No. 13-9598
(Petition for Review)

ORDER AND JUDGMENT[*]

Before **HOLMES**, **ANDERSON**, and **BALDOCK**, Circuit Judges.

Adam Ssensamba Ddungu, a native and citizen of Uganda proceeding pro se,

petitions for review of the denial of his applications for asylum, restriction on

removal (formerly known as withholding of removal), relief under the Convention

Against Torture (CAT), and cancellation of removal. Our jurisdiction arises under

8 U.S.C § 1252(a). We dismiss in part and deny review in part.

---

[*]    After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist the determination of this
appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

*Background*

Mr. Ddungu's family was wealthy when he was younger; his father sold cattle to the government and later had a tannery. Mr. Ddungu testified that his father and the family changed political affiliation and religion as necessary when regimes changed. Ultimately, however, his father fell out of favor and the government confiscated the business. Mr. Ddungu entered the United States in November 1991 on a one-year business visa. He testified that he intended to sue the Ugandan government over the loss of the business and then go home, but he never left. His father, mother, and numerous siblings and half-siblings remained in Uganda.

In 1998, Mr. Ddungu was detained on criminal charges in New Jersey. After spending 570 days in custody awaiting trial, in 2000 he pleaded guilty to one count of misdemeanor theft by deception in violation of N.J. Stat. Ann. § 2C:20-4. He states that he pleaded guilty only because he was unable to pay the assessed bail and had spent such a long time in custody. He did not receive any prison time for this conviction. Also in 2000, a Ugandan magistrate issued an arrest warrant charging Mr. Ddungu with treason. Mr. Ddungu testified that he did not know why the arrest warrant was issued. He surmised it might be connected to certain business activities with Ugandans and/or his legal problems in New Jersey.[1]

---

[1] In his reply brief, Mr. Ddungu suggests that the arrest warrant was connected to his family's political activities. Our review, however, is limited to the evidence in the administrative record. *See* 8 U.S.C. § 1252(b)(4)(A).

In 2006, Mr. Ddungu was served with a notice of removal. In March 2007, he filed for asylum, restriction on removal, and CAT relief. In a comprehensive written order, the IJ found Mr. Ddungu generally credible, but nevertheless he denied relief on all grounds.[2]

Issuing its own order, the BIA adopted the IJ's decision with further discussion of particular issues. It affirmed the denial of asylum because Mr. Ddungu had not filed within the one-year limitations period and had not established any statutory exception to the limitations period. It affirmed the denial of restriction on removal because Mr. Ddungu failed to show that he had a definite political position, as he and his family changed positions as necessary to accommodate changing regimes. It also held that he failed to show past persecution or that any problems he fears in the future would be on account of his political opinion. The BIA affirmed the denial of CAT relief because Mr. Ddungu had not shown that it was more likely than not that he would be tortured by or with the acquiescence of a Ugandan government official. And finally, it noted that for the first time on appeal, Mr. Ddungu requested cancellation of removal. It denied the request on the ground that the New Jersey conviction made him statutorily ineligible for cancellation.

---

[2] Initially Mr. Ddungu sought relief for political opinion, religion, and membership in a particular social group, but the IJ considered only political opinion because he did not present any argument or evidence regarding the other grounds for relief. *See* Admin. R. at 102 n.1. Mr. Ddungu did not challenge before the BIA this narrowing of the issues. We therefore focus solely on political opinion.

*Analysis*

Although we will "limit [the] grounds for affirmance to those articulated in the BIA's final order," we may also consider the IJ's more complete explanation of the same grounds. *Barrera-Quintero v. Holder*, 699 F.3d 1239, 1244 (10th Cir. 2012). We review the BIA's factual findings for substantial evidence, and its legal conclusions de novo. *Witjaksono v. Holder*, 573 F.3d 968, 977 (10th Cir. 2009). Under the substantial-evidence test, "factual findings are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Dallakoti v. Holder*, 619 F.3d 1264, 1267 (10th Cir. 2010) (internal quotation marks omitted); *see also* 8 U.S.C. § 1252(b)(4)(B).

## I.    Due Process

Mr. Ddungu makes two general arguments in the nature of due process. First, he asserts that the BIA did not receive the entire administrative record, and he identifies certain evidence he submitted that, he believes, would have changed the agency's decision. But all but one of those documents are in the record before this court, which has been certified as the true, correct, and complete administrative record.[3] There are no grounds to believe that the BIA did not have the complete administrative record. Second, in his reply brief, he states that the transcript of his

---

[3]    The exception is the 2009 Department of State report on Uganda. The record does contain the 2006, 2007, 2008, and 2010 reports, however, and there is no indication that the 2009 report actually was submitted to the IJ or that it would add anything to the information in the other reports.

hearing had "so many missing word[s], statements, wrong added words, twisted names, plus false information to discredit his petitioner's testimony." Reply Br. at 9. He cannot raise this argument before this court, however, because it does not appear that he raised it before the BIA. *See Akinwunmi v. INS*, 194 F.3d 1340, 1341 (10th Cir. 1999) (per curiam). And generally we do not hear arguments first raised in a reply brief. *See Stump v. Gates*, 211 F.3d 527, 533 (10th Cir. 2000).

## II.    Asylum

The BIA agreed with the IJ that Mr. Ddungu was ineligible for asylum because he did not timely file his asylum application and did not establish an exception to the one-year filing deadline. Mr. Ddungu asserts that the BIA erred in applying the deadline to him because there was no filing deadline when he entered this country. He also asserts that he did demonstrate changed or extraordinary circumstances.

This court has jurisdiction to review the denial of asylum for untimeliness only if the petitioner presents a constitutional claim or a question of law. *See Diallo v. Gonzales*, 447 F.3d 1274, 1281 (10th Cir. 2006); 8 U.S.C. § 1252(a)(2)(D). As an issue of statutory interpretation, the argument about the applicability of the filing deadline qualifies as a question of law. *See Diallo*, 447 F.3d at 1282. However, it is meritless. Although there was no asylum filing deadline when Mr. Ddungu entered the United States, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) created one, and it did not except aliens who entered before IIRIRA's effective date of April 1, 1997. As an alien already present on that date,

Mr. Ddungu had one year from April 1, 1997, to file for asylum. *See* 8 C.F.R.

§§ 208.4(a)(2)(ii), 1208.4(a)(2)(ii). His 2007 application therefore was untimely.

The argument that Mr. Ddungu qualifies for an exception to the statutory

deadline based on changed or extraordinary circumstances is couched in the brief as a

question of law, but really it "is a challenge to an exercise of discretion that remains

outside our scope of review." *Ferry v. Gonzales*, 457 F.3d 1117, 1130 (10th Cir.

2006). Accordingly, we lack jurisdiction to consider this argument. *See id.*

## III.    Restriction on Removal[4]

Restriction on removal requires showing "that the alien's life or freedom

would be threatened in [his] country because of [his] race, religion, nationality,

membership in a particular social group, or political opinion." 8 U.S.C.

§ 1231(b)(3)(A); *see also Dallakoti*, 619 F.3d at 1267-68. The BIA agreed with the

IJ that Mr. Ddungu failed to establish that any harm that had or would come to him

would be "because of" his political opinion, stating, "[t]he respondent and his family,

his father in particular, adapted to the political party in power in Uganda at any given

time in an effort to maintain a business relationship with the government. . . . The

---

[4]      In a supplemental filing, Mr. Ddungu asserts that the IJ discussed an incorrect charge in his analysis of restriction on removal. He is mistaken. The IJ cited Immigration and Nationality Act § 241(b)(3)(B)(ii) not as a basis of removability, but to determine whether the New Jersey conviction rendered Mr. Ddungu ineligible for restriction on removal. The IJ resolved this issue in favor of Mr. Ddungu. Even if this argument had been presented to the BIA, it would provide no grounds for remanding this matter to the agency.

- 6 -

respondent did not testify to any political opinion on either his or his father's part that would lead to problems in Uganda." Admin. R. at 3.

This determination is supported by substantial evidence, and no reasonable adjudicator would be compelled to come to a contrary determination. Mr. Ddungu testified that the family transferred from one political party to another as regimes changed in Uganda, and that while he lived there, he changed his own political affiliation as his father directed. He now considers himself a member of the UPC party, but he is open to changing his affiliation. Although he has been politically active since being in the United States, he also indicated his involvement was not significant. As for the arrest warrant issued by a Ugandan magistrate, Mr. Ddungu testified that he did not know why it was issued, unless it had to do with his business activities and/or the New Jersey legal proceedings. Thus, there is no record evidence to support a conclusion that the arrest warrant was politically motivated. In short, Mr. Ddungu's failure to establish a nexus between any harm that has or that may come to him and a protected ground supports the BIA's denial of restriction on removal. *See Dallakoti*, 619 F.3d at 1268.

## IV. CAT Relief

"To receive the protections of the CAT, an applicant must demonstrate 'it is more likely than not that he or she would be tortured if removed to the proposed country of removal.'" *Ritonga v. Holder*, 633 F.3d 971, 978 (10th Cir. 2011) (quoting 8 C.F.R. § 1208.16(c)(2)). For CAT relief, a petitioner need not show "that

torture will occur on account of a statutorily protected ground." *Id.* (internal quotation marks omitted). Instead, he must establish he will be treated so severely "as to constitute torture," "by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *Id.* (citation and internal quotation marks omitted). The BIA held that Mr. Ddungu failed to establish that it is more likely than not that he would be tortured by anyone in an official capacity. "Although [he] has submitted a warrant for his arrest, he has presented very little other evidence that the government of Uganda has any ongoing interest in him or that he would face torture." Admin. R. at 4.

Asserting that it is the current Ugandan government that he fears, Mr. Ddungu points to the arrest warrant, the fact that one of his brothers disappeared after being removed from the United States to Uganda, and the record evidence regarding Uganda's poor human rights practices. The record does reflect that persons in Uganda have been tortured. *See, e.g.*, *id.* at 214, 218, 222 (2010 United States Department of State Human Rights Report: Uganda); *see also id.* at 349-50 (State of Pain: Torture in Uganda (Human Rights Watch 2004)); *id.* at 396 (Open Secret: Illegal Detention and Torture by the Joint Anti-terrorism Task Force in Uganda (Human Rights Watch 2009)). The record also reflects that Mr. Ddungu's brother was detained upon being returned to Uganda, with the family hiring a private investigation firm to determine his whereabouts. But this court does not make a CAT determination in the first instance; to grant review, we must be convinced that, on

this administrative record, any reasonable adjudicator would *have* to conclude that it is more likely than not that Mr. Ddungu will experience torture if removed to Uganda. *See* 8 U.S.C. § 1252(b)(4)(B); *Dallakoti*, 619 F.3d at 1267; *Ritonga*, 633 F.3d at 978. We are not so convinced.

As stated, the arrest warrant is unexplained. Further, it appears that Mr. Ddungu's missing brother was a member of the Allied Democratic Forces (ADF), a rebel group engaged in armed conflict, including bombings. Mr. Ddungu is not a member of ADF. Although his brother's disappearance is disquieting, it does not *compel* a conclusion that Mr. Ddungu is more likely than not to suffer torture. Similarly, the record evidence regarding Uganda's human rights practices does not *compel* that conclusion. We cannot grant review of the denial of CAT relief.

## V.    Cancellation of Removal

Mr. Ddungu sought cancellation of removal before the BIA. Apparently considering the New Jersey conviction for theft by deception to be a crime involving moral turpitude (CIMT), the BIA held that he was statutorily ineligible for cancellation. *See Barrera-Quintero*, 699 F.3d at 1243; 8 U.S.C. § 1229b(b)(1)(C). Mr. Ddungu asserts that his conviction does not qualify as a CIMT. It is his burden to show that the conviction does not disqualify him from eligibility for cancellation of removal, not the government's burden to show that it does. *See Garcia v. Holder*, 584 F.3d 1288, 1289-90 (10th Cir. 2009).

This court generally lacks jurisdiction to review a denial of cancellation of removal, but a determination that a crime is a CIMT is a question of law reviewable under § 1252(a)(2)(D). *Rodriguez-Heredia v. Holder*, 639 F.3d 1264, 1267 (10th Cir. 2011). Our review is de novo. *Id.* "To determine whether a state conviction is a crime involving moral turpitude, we ordinarily apply the categorical approach." *Id.* Under that approach, "this court looks only to the statutory definition of the offense and not to the underlying facts of the conviction to determine whether the offense involves moral turpitude." *Efagene v. Holder*, 642 F.3d 918, 921 (10th Cir. 2011). "Moral turpitude refers to conduct which is inherently base, vile, or depraved, contrary to the accepted rules of morality and duties owed between man and man, either one's fellow man or society in general." *Id.* (internal quotation marks omitted).

Section 2C:20-4[5] provides that "[a] person is guilty of theft if he purposely obtains property of another by deception." Courts "repeatedly have held that 'theft' is a crime of moral turpitude." *Hashish v. Gonzales*, 442 F.3d 572, 576 (7th Cir. 2006) (collecting cases). Moreover, the statute addresses theft by deception, which appears to be a species of fraud. *Compare* N.J. Stat. Ann. § 2C:20-4 ("A person deceives if he purposely: a. Creates or reinforces a false impression . . . ; b. Prevents another from acquiring information which would affect his judgment of a transaction;

---

[5] Section 2C:20-4 was amended in 2003, but the amendments do not appear to affect the analysis of whether Mr. Ddungu's 2000 conviction is a CIMT.

or c. Fails to correct a false impression which the deceiver previously created or reinforced, or which the deceiver knows to be influencing another to whom he stands in a fiduciary or confidential relationship."), *with* Black's Law Dictionary 731 (9th ed. 2009) (defining fraud as "[a] knowing misrepresentation of the truth or concealment of a material fact to induce another to act to his or her detriment"). "[W]e have followed Supreme Court precedent making it plain that crimes in which fraud was an ingredient have always been regarded as involving moral turpitude." *Rodriguez-Heredia*, 639 F.3d at 1268 (internal quotation marks omitted). In contrast, Mr. Ddungu has not identified any authorities that would undermine the agency's conclusion that a violation of § 2C:20-4 is a CIMT. Accordingly, he has not satisfied his burden of showing that he is eligible for cancellation of removal. *Cf. Garcia*, 584 F.3d at 1290 (holding that alien had not proven his eligibility for cancellation of removal where the record of conviction was ambiguous, even though alien was not to blame for the ambiguity).

## *Conclusion*

Mr. Ddungu's motion for leave to proceed on appeal without prepayment of costs or fees is granted. The request to review the denial of asylum is dismissed in part for lack of jurisdiction. The remainder of the petition for review is denied.

Entered for the Court

Bobby R. Baldock
Circuit Judge

- 11 -